Westlaw

Not Reported in F.Supp.2d                                                                                             Page 1
Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
(Cite as: Not Reported in F.Supp.2d)

Farage v. Johnson-McClean Technologies, Inc.
S.D.N.Y.,2002.

United States District Court, S.D. New York.
Regina FARAGE, Plaintiff,
v.
Johnson-McClean TECHNOLOGIES, Inc. a/k/a JMT, Inc. and Charles William Johnson, Defendants.
No. 01 CIV. 4856(LMM).

May 29, 2002.

MEMORANDUM AND ORDER
MCKENNA, D.J.

*1 Plaintiff Regina Farage (" Plaintiff" or " Farage" ) commenced this employment action against Johnson-McClean Techonologies, a/k/a JMT, Inc. (" Johnson-McClean" or " Company" ) and Charles William Johnson (" Johnson" ) alleging: (1) gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the New York City Human Rights Law (" NYCHRL" ), codified at N.Y.C. Admin. Code § 8-101 *et seq.*, and the New York State Human Rights Law (" NYSHRL" ), codified at N.Y. Exec. Law § 290 *et seq.*; (2) violations of the Family and Medical Leave Act (" FMLA" ), 29 U.S.C. § 2601 *et seq.*; (3) violations of New York Labor Law § 198 for failure to pay wages and commissions; (4) breach of contract and unjust enrichment; and (5) violations of the Employee Retirement Income Security Act of 1974 (" ERISA" ), 29 U.S.C. § 1132. Defendants move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) with regard to the sex discrimination and retaliation claims and two of the three ERISA claims.[FN1] For the reasons set forth below, the motion is granted in part and denied in part.

FN1. Defendants withdrew their motion with regard to plaintiff's FMLA claim in their Reply Brief. (Defs.' Reply Mem. at 6 n. 1.)

Background [FN2]

FN2. For the purpose of resolving this motion, all facts are construed in favor of the plaintiff.

Plaintiff was employed as an information technologist by Johnson-McClean from approximately January 1998 until her termination in January 2000. Defendant Johnson is the founder and Chief Executive Officer of the Company. (Compl.¶ 4.) In December 1997, plaintiff and Johnson-McClean entered into a written employment contract which set forth specific terms including her salary, commissions, 401K Plan, and health benefits. (Id. ¶¶ 7-8.)

Plaintiff alleges that shortly after she was hired, Johnson began to sexually harass her. (Id.¶ 10.) Specifically, " Johnson began a practice of kissing plaintiff, on the lips, on a regular basis." (Id.) According to plaintiff, this activity occurred repeatedly during plaintiff's entire career at Johnson-McClean. (Id.) Plaintiff rebuffed Johnson's harassment and on a number of occasions told Johnson that his conduct was inappropriate and that it made her feel uncomfortable. (Id.¶¶ 11-12.) Plaintiff claims that Johnson ignored her concerns and continued kissing her in the workplace. (Id.¶ 13.)

Plaintiff further alleges that in addition to the kissing, Johnson would touch her on a regular basis by grabbing her shirt or jacket near her breasts, rubbing the material so that he brushed up against her skin and commenting on the quality of the shirt's fabric .(Id.) Plaintiff also claims that Johnson continuously made inappropriate sexual comments and that he would get up while plaintiff was sitting and gently grope his genitals in an attempt to arouse plaintiff. (Id.¶¶ 15-16.)

In addition to these allegations which plaintiff claims occurred continuously throughout the course of her employment, plaintiff has alleged a few isolated incidents in detail. In the first of these alleged incidents, which plaintiff refers to as " The Waterfront Incident," Johnson insisted that plaintiff meet him at his Manhattan apartment on a Saturday to discuss a work project. (Id. ¶¶ 18-19.) Upon her arrival, Johnson took her to brunch instead and " chatted with her about everything except business, asking plaintiff about whether she was in a relationship and why wasn't she married." (Id.¶ 20.) Plaintiff told Johnson that she was engaged and that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 2
Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
(Cite as: Not Reported in F.Supp.2d)

she was there to discuss business only. (Id.¶¶ 21-22.) However, after brunch, Johnson led plaintiff to the waterfront at West 54th Street at which point, plaintiff again asked Johnson if they could discuss the work project. (Id.¶ 24.) Instead, Johnson talked only about his personal life and put his arm close to plaintiff as they sat on a bench at the waterfront. (Id.¶¶ 25, 27, 28-30.) Finally, plaintiff left the Johnson at the waterfront. (Id.¶ 31.) Plaintiff alleges that Johnson never intended to discuss business that Saturday, but instead he "merely wanted to sow the seeds of romance and use plaintiff in a manner that her employment contract-and the law-did not permit." (Id.¶ 32.)

*2 The second incident, which plaintiff refers to as "The Secret Apartment," occurred a few months later when Johnson asked plaintiff to meet a client with him on a Sunday, despite plaintiff's protests that she was available during the week for such a meeting and that she had a planned family event that weekend. (Id.¶¶ 33-34.) Plaintiff consented because Johnson insisted that it was imperative and that it concerned consolidating the organizational structure of the Company. (Id.¶ 34.) Plaintiff met Johnson in the lobby of his apartment where the two briefly discussed one of the Company's clients. (Id.¶ 35.) Johnson then took plaintiff in his car to a residential apartment where the doorman knew Johnson and which Johnson opened with his own key. (Id.¶¶ 36-37.) Soon after, plaintiff realized that this was not the client's apartment, but rather, Johnson's corporate apartment. (Id.¶ 38.) When plaintiff asked about the client, Johnson replied, "Maybe you misunderstood." (Id.¶ 39.) Once Johnson failed to discuss business and began talking about his personal life, plaintiff told Johnson she had to go. (Id.¶ ¶ 43-44.) Johnson insisted that she ride with him in her car. (Id.¶ 45.) When they reached Johnson's parking garage, he invited plaintiff upstairs and drew close to kiss her. (Id.¶ 50.) However, plaintiff declined, extended her hand, blocked his advance and got out of the car. (Id.¶ 51.)

The third incident occurred at a pool party at a client's home which was attended by numerous Johnson-McClean employees. (Id.¶ 51.) Plaintiff arrived at the party with some pastries, which she went to bring over to the host, who was standing with Johnson. (Id.) As she approached the host, Johnson walked toward her, put his arm around her, and said "Honey, you remembered to bring the pastries-thank you so much!" (Id.) At this point, he also gave her a kiss. (Id.) Plaintiff alleges that Johnson pursued her throughout the day. (Id.¶ 52.) For example, at one point while plaintiff was sitting with two other people, Johnson got out of the pool in his Speedo bikini, sat next to plaintiff, put one leg up on a chair, and exposed and lightly grabbed his crotch. (Id.¶ 54.) Plaintiff was disgusted and moved her seat. (Id.) But when one of the other people got up, Johnson moved over to sit next to plaintiff again to continue the alleged harassment. (Id.¶ 55.) This time, Johnson grabbed plaintiff's necklace in front of a group of people and said " Isn't this the necklace I bought for you?" (Id.) Plaintiff, shocked, appalled, and embarrassed, immediately responded, " No you've never bought me jewelry! My fiancé bought this for me!" (Id.¶ 56.) Johnson, however, kept insisting that he bought plaintiff jewelry to which plaintiff responded, " Bill you've never bought me jewelry and if you did I would never accept it." (Id. ¶ 57.) The people around this scene expressed outrage and disgust at Johnson's actions. (Id.¶ 58.)

*3 In addition to these isolated incidents, plaintiff claims that Johnson " had a penchant for hiring women whom he found attractive and marketing them to clients on the basis of their physical attributes." (Id.¶ 59.) The complaint lists examples of such behavior. (Id.¶¶ 60-64.) According to plaintiff, Johnson invited her to client-development meetings to " look pretty." (Id.¶ 65.) On these occasions, Johnson would comment to clients about how beautiful plaintiff was, which made plaintiff feel cheap. (Id.)

Johnson's alleged harassment continued and in November 1999, Johnson entered into a group meeting and kissed plaintiff in the presence of Jim Firlow (" Firlow" ), Johnson-McClean's Chief Operating Officer and two other employees. (Id.¶ 66.) Plaintiff was enraged, and shouted to Firlow, " Enough is enough! You see what I am talking about! This has got to stop!" (Id.) Firlow responded, " I've been telling Bill for a long time that one day he's going to get himself in trouble legally and there will be no way out." (Id.¶ 67.) According to plaintiff, she complained to Firlow on numerous other occasions about Johnson's behavior. (Id.¶ 68.) Subsequently, Johnson kissed plaintiff again in December 1999 at which point plaintiff said to Firlow, " The next time this happens I'm taking legal action. This has to stop. There are legal ramifications for his behavior! It's appalling!" (Id.¶ 69.)

Within weeks after making this statement, plaintiff's employment was terminated. (Id.¶ 70.) Specifically,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3

Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973

(Cite as: Not Reported in F.Supp.2d)

plaintiff received a letter dated January 31, 2000, in which the Company wrote, " as of January 15, 2000 you are no longer employed by JMT." (Id.) The letter states that the reason for her termination was " cost-containment." (Id.¶ 75.) Plaintiff contests that her termination was due to " cost-containment" because she had brought in so much business for the company. (Id.¶ 75.) In addition, plaintiff had been working between January 15, 2000 and January 31, 2000 but alleges that she was taken off the payroll as of the end of December 1999 and had not received her paycheck for January. (Id.¶¶ 71.)

Upon receipt of the letter, plaintiff immediately called Firlow who said to plaintiff, " You know this wasn't my doing." (Id.) Firlow told plaintiff that he could not dispute her good work performance, and that two managers from a client had called on numerous occasions to compliment plaintiff's work. (Id.) Firlow also told plaintiff that " Bill will hold on to the people that are loyal to him" and that plaintiff was loyal to the rest of the firm " but to [Johnson]-you know what he thinks." (Id.¶ 72.) On February 10, 2000, plaintiff met with Johnson to discuss why her employment had been terminated. (Id.¶ 74.) His only response was that " I fell out of love with you." (Id.)

In addition to the claims of sexual harassment and retaliation, plaintiff alleges that the Company owes her: (1) at least $20,000 in commissions; (2) salary for the entire month of January; (3) $6,874.80 in vacation time; (4) $4,151 in overtime; and (5) $6,540 in reimbursement for medical expenses and health insurance premiums. (Id.¶ 76.) Further, with regard to plaintiff's 401K plan, plaintiff alleges that defendant did not match contributions for all of the year 1998 until sometime in 1999 after protests. (Id.¶ 77.) Thus, plaintiff lost money from that contribution because she was unable to benefit from a strong market in 1998.(Id.) In addition, plaintiff does not believe that the Company made contributions for 1999. (Id.¶¶ 77-80.)

*4 Plaintiff further alleges that the defendants violated the FMLA in the following manner. Plaintiff, after consulting with surgeons, needed to have surgery on both of her feet due to a serious bunion condition known as Hallux Valgus. (Id.¶ 81.) Plaintiff informed the Company that she needed the surgery, which involved three procedures to each foot, and four to six weeks on crutches after each operation. (Id.¶ 82.) She told the Company that the first procedure was scheduled for June 3, 1999.(Id.)

However, on June 2, 1999, after all the arrangements had been made, Firlow told plaintiff that she would have to postpone the surgery until September in order to work on a Company project. (Id.¶ 84.) According to plaintiff, Firlow refused to listen to plaintiff's protests that she could not postpone the surgery until September because she had already made post-surgery arrangements and that her medical coverage was going to change and the surgery would then be more expensive. (Id.¶¶ 85-86.) Firlow told plaintiff that Johnson-McClean would provide her with up to $1000 for the added expense. (Id.¶ 86.) In September, defendants again refused to give plaintiff time off for the surgery and plaintiff suffered serious consequences-she continued to have severe foot pain, her posture was altered, and now the foot surgery will not be covered in full. (Id.¶ 87.)

In addition, plaintiff claims that defendants violated the FMLA after plaintiff was in a car accident on November 23, 1999 because they refused to give her the minimum of time off her doctors said was necessary to recover from the accident. (Id.¶¶ 89-90.) Plaintiff suffered at least one torn rotator cuff, as well as neck and back injuries in the accident, and when she returned to work on a project upon Firlow's and Johnson's insistence, she was doing too much work for her condition and asked for more assistance on the project. (Id.¶ 91-92.) But according to plaintiff, Firlow and Johnson refused to provide more assistance and insisted that she do the work. (Id.¶ 92.) Moreover, the two denied her requests to work from home despite her excruciating pain. (Id.) This atmosphere continued throughout the course of the project and even after, with Firlow and Johnson pressing plaintiff to do more work than she could handle in her present physical state. (Id.¶¶ 93-104.) During the period when plaintiff worked under such conditions, she received great reviews from the clients and Firlow. (Id.¶ 105.)

Nonetheless, plaintiff was fired. On November 9, 2000 plaintiff filed an Equal Employment Opportunity Commission (" EEOC" ) charge with the New York Commission on Human Rights alleging sex discrimination and retaliation. (Defs.' Mot. to Dis. Ex. B.). This lawsuit ensued.

Discussion

A. 12(c) Legal Standard

The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
(Cite as: Not Reported in F.Supp.2d)

12(b)(6) motion for failure to state a claim. *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 125 (2d Cir.2001). The Court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). A court should dismiss a complaint only " if ' it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

B. Title VII, NYSHRL, and NYCHRL Claims [FN3]

> FN3. In light of the Supreme Court's recent decision in *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002), defendants, in their Reply Brief, withdrew their substantive arguments for dismissal of these claims. (Defs.' Reply Mem. at 1-2.)

1. Statute of Limitations

*5 Under Title VII of the Civil Rights Act of 1964, it is an " unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII explicitly requires that an EEOC charge be filed within 180 days of the alleged unlawful activity or 300 days after the alleged unlawful activity if the claimant has already filed a discrimination charge with a state or local equal employment agency. *Id.* § 2000e-5(e)(1). According to the Second Circuit, " [t]his requirement functions as a statute of limitations ... in that the discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiffs' suit in district court." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (citations omitted).

Here it is not disputed that the 300 day period applies because a charge of discrimination was filed with the New York City Commission on Human Rights on November 9, 2000. In addition, plaintiff concedes that " she will not invoke Title VII protection for any events occurring before January 14, 2000," 300 days before she filed her charge. (Pl.'s Mem. in Opp'n at 6.) Defendant's argument that plaintiff " had notice of her termination by December 31, 1999" and thus that her sex discrimination and retaliation claims are time-barred, is unavailing because there is nothing in the Complaint indicating that plaintiff received such notice. The Complaint clearly states that the first time plaintiff became of aware her termination was by a letter dated January 31, 2000. (Compl.¶ 70.) Therefore, plaintiff's Title VII claims are not time-barred with regard to plaintiff's termination, which occurred within the 300 day limitations period.

Under the NYSHRL and the NYCHRL, it is also unlawful for an employer to discriminate against an employee based on gender. N.Y. Exec. Law § 296(1)(a) (McKinney 2001); N.Y.C Admin. Code § 8-107(1)(a). Likewise, it is forbidden under the NYHRL and the NYCHRL for an employer to retaliate against an individual who has opposed the discriminatory practices. N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8-107(7). Defendants argue that plaintiff's discrimination and retaliation claims under the NYSHRL and NYCHRL are time-barred in part. (Defs.' Mem. of Law in Supp. of Mot. for J. on Pleadings at 9.) Under the NYCHRL and the NYSHRL, a plaintiff suing for discrimination must file a lawsuit within three years after the alleged unlawful practice. *Quinn*, 159 F.3d at 765; N.Y .C. Admin. Code § 8-502(d).

Plaintiff filed this lawsuit on June 4, 1998. Thus, defendants argue that the events in the Complaint prior to June 4, 1998 are time-barred. (Defs.' Mem. of Law in Supp. of Mot. for J. on Pleadings at 10-11.) In response, plaintiff claims that the acts prior to June 4, 1998 are not time-barred because they are part of a continuing course of conduct, and therefore, the date of occurrence " ' shall be deemed any date subsequent to its inception up to and including the date of its cessation" ' . (Pl.'s Mem. in Opp'n at 7) (citing N.Y.C.R.R. § 465.3(e)) Plaintiff specifically states that she is not invoking the " continuing violation" theory applied in Title VII cases. (Id. at 9 n1.)

*6 The standards for analyzing discrimination claims brought under the NYSHRL and the NYCHRL, including continuing violations, are the same as for those brought under Title VII. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Walsh v. Covenant House*, 664 N.Y.S.2d 282, 283 (N.Y.App.Div.1997) (noting that the only difference between laws is that the NYCHRL provides for the recovery of punitive damages). Because the Court rejects plaintiff's attempt to use a general continuing wrong theory because it is not applicable in this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employment discrimination case, and the plaintiff does not claim reliance on the applicable continuing violation theory, the acts before June 4, 1998 are time-barred to the extent plaintiff wishes to recover for damages on them. That does not mean that the acts may not be used as evidence to support her discrimination claims.

### 2. Claims against Johnson

The Court must decide whether plaintiff may maintain her Title VII, NYSHRL and NYCHRL claims against Johnson, to the extent that are not time-barred as discussed above. The Second Circuit has held that only employers, not individual employees, can be held liable for Title VII violations. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995). Thus, both Title VII claims (Counts One and Four) against Johnson are dismissed.

As for the NYSHRL, the New York Court of Appeals has ruled that a corporate employee cannot be held individually liable in an employment discrimination action unless he is shown to have an ownership interest in the employer's business or the authority " to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank*, 483 N.Y.S.2d 659, 660 (1984). However, the Second Circuit recently held that an individual " who actually participates in the conduct giving rise to a discrimination claim may be held personally liable" because § 296(6) of the NYSHRL states that it is unlawful discriminatory practice " ' for any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so." ' *Tomka*, 66 F.3d at 1317 (citing N.Y. Exec. Law § 296(6)). New York courts post-*Tomka* are split on whether the Second Circuit correctly interpreted the aider and abettor law. Compare *Trovato v. Air Express Int'l*, 655 N.Y.S.2d 656, 657 (N.Y.App.Div.1997) (rejecting *Tomka* and concluding that finding " a co-employee liable as an aider and abettor would ignore the statutory and legal authority limiting the parties who may be sued for employment discrimination" ); *Foley v. Mobil Chemical Co.*, 647 N.Y.S.2d 374, 380-81 (N.Y.Sup.Ct.1996) (same) with *Ahmed v. Compass Group*, 99 Civ. 10032, 2000 WL 1072299, at *5 (S.D.N.Y. Aug. 3, 2000)(relying on *Tomka* 's conclusion); *Steadman v. Sinclair*, 636 N.Y.S.2d 325, 326 (N.Y.App.Div.1996) (same). The New York Court of Appeals has not ruled on this issue.

Here, plaintiff's allegations are sufficient to support a claim against Johnson under the NYSHRL regardless of which standard is applied. Under the *Patrowich* standard, plaintiff has adequately alleged that Johnson has control over personnel decisions. (Compl.¶¶ 71-74.) Under the *Tomka* standard, which the Court is bound to follow, plaintiff has alleged that Johnson was the main participant in the sexual harassment and the sexual discrimination. (Compl.¶¶ 10-88.) Therefore, plaintiff's discrimination and retaliation claims may go forward under the NYSHRL. The same analysis applies to plaintiff's claim under the N.Y.C. Admin. Code, which has an identical aider and abettor provision to the NYSHRL, N.Y.C. Admin. Code. § 8-107(6). *Ettinger v. State Univ. of N.Y. State College of Optometry*, 95 Civ. 9893, 1998 WL 91089, at *10 (S.D.N.Y. Mar. 2, 1998). Thus, plaintiff's claims against Johnson under the NYCHRL may also go forward.

### C. ERISA Claims [FN4]

> FN4. Plaintiff concedes that, based on the facts in her complaint, she brings ERISA claims only against the Company, not Johnson. (Pl.'s Mem. in Opp'n at 3.)

*7 Defendants further moves to dismiss two of plaintiff's three ERISA claims (Counts Eleven and Twelve) as time-barred. Under 29 U.S.C. § 1113:
[n]o action may be commenced ... with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part after the earlier of -
(1) six years after (A) the date of the last action which constitutes a part of the breach of violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation.

29 U.S.C. § 1113. Thus, an ERISA " suit must be commenced within three years after the plaintiff acquires actual knowledge of the breach, with an outside limit of six years after the breach." *Harris Trust and Savings Bank v. John Hancock Mut. Life Ins. Co.*, 122 F.Supp.2d 444, 463 (S.D.N.Y.2000). The Second Circuit has held that " actual knowledge" in this provision means " knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193, 194 (2d Cir.2001)(rejecting a constructive

knowledge standard). "[A] plaintiff need not have knowledge of the relevant law ... [but] he must have knowledge of all facts necessary to constitute a claim." *Id.* (citation omitted). Defendants bear the burden of establishing that plaintiff had actual knowledge. *McDonell v. Costigan,* 00 Civ. 4598, 2002 WL 313528, at *7 (S.D.N.Y. Feb. 2, 2002). Thus, under the standard, defendants must show "that plaintiffs knew not only of the relevant events that occurred, but also that those events supported a claim for breach of fiduciary duty or violation under ERISA." *Id.* (citing *Caputo,* 267 F.3d at 193) ("The disclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of an underlying claim.").

In this case, defendants argue that plaintiff had actual knowledge of the alleged ERISA violations because she made "repeated protests" in 1998 that the Company was not matching her 401K contributions. (Compl.¶ 77). However, defendants do not meet their burden of showing that plaintiff had "actual knowledge" before June 4, 1998, three years before this action was filed. The protests might have been made after June 4th in the year 1998 and thus, the Court cannot dismiss these ERISA claims as time-barred.

## CONCLUSION

In sum, the defendants' motion for judgment on the pleadings is granted in part and denied in part. The Title VII claims will go forward only against the Company and only as to acts which occurred after January 14, 2001. The NYSHRL and NYCHRL claims will go forward against both defendants for acts which occurred after June 4, 1998. The ERISA claims will go forward against the Company. All other claims alleged in the Complaint were not challenged in this motion.

*8 So Ordered.

S.D.N.Y.,2002.
Farage v. Johnson-McClean Technologies, Inc.
Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Grasso v. Chase Manhattan Bank
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Francisco GRASSO, Plaintiff,
v.
CHASE MANHATTAN BANK, at al. Defendants.
No. 01 Civ. 4371(AKH).

April 17, 2002.

MEMORANDUM AND ORDER GRANTING MOTION TO DISMISS PORTIONS OF THE AMENDED COMPLAINT

HELLERSTEIN, J.

*1 Defendants Chase Manhattan Bank and Carol A. Pizzingrillo move to dismiss portions of plaintiff Francisco Grasso's pro se employment discrimination lawsuit based upon defendants' refusal to hire plaintiff in connection with several employment applications from 1992 through 2001. In his amended complaint, plaintiff alleges that defendants' actions violated the Age Discrimination in Employment Act (ADEA) and Title VII of the Civil Rights Act. Plaintiff further alleges claims for intentional and negligent infliction of emotional distress, deceptive advertising, entrapment, and intentional and negligent infliction of emotional distress under the Jones Act.

For the reasons explained below, I grant defendant Chase Manhattan's motion to dismiss all of plaintiff's employment discrimination claims under Title VII and the ADEA based on events occurring over 300 days before February 7, 2001, when plaintiff filed a charge with the EEOC. I also dismiss plaintiff's claims for negligent and intentional infliction of emotional distress under both common law and the Jones Act, deceptive advertising, and entrapment for failure to state a claim. Finally, I dismiss all of plaintiff's claims against the individual defendants, including Carol A. Pizzingrillo, Jane Does numbers one through three, and John Doe, because there is no individual liability for employment discrimination under Title VII or the ADEA.

Therefore, Plaintiff's only remaining claims are those under Title VII and the ADEA alleging that Chase discriminated against him on the basis of race, national origin, and age when it refused to hire him in January 2001.

I. *Background*

Plaintiff Francisco Grasso alleges that he is an Hispanic male born in Costa Rica on September 12, 1956. His original complaint, filed May 22, 2001, alleged causes of action under Title VII and the ADEA arising from defendant Chase Manhattan Bank's (" Chase" ) denial of his January 2001 application for employment as a teller. Plaintiff alleged that Chase's decision based on his race, national origin and age. On August 27, 2001, plaintiff filed an amended complaint which added additional Title VII and ADEA causes of action based upon Chase's denial of previous employment applications in 1992 through 1995 and in December 1998. The amended complaint also alleged additional causes of action for intentional and negligent infliction of emotional distress under both New York law and the Jones Act, as well as claims for deceptive advertising and entrapment.

In his amended complaint, plaintiff alleges that defendants discriminated against him in refusing to hire him over three distinct time periods. Plaintiff alleges that he applied for jobs with Chase several times between 1992 and 1995. During this period, he alleges that he was twice interviewed by an African-American female who was " odious in her demeanor" toward him. He alleges that she refused to consider him for employment despite his having passed Chase examinations in mathematics and reasoning.

*2 For the second group of incidents of discrimination, the amended complaint alleges that plaintiff again applied for a position as a teller at Chase's Long Beach branch in December of 1998.FN1 Again, he alleges that he passed the examination given and was offered training for the job. Plaintiff returned for training and completed additional testing. He then alleges that defendant Carol A. Pizzingrillo told him that he had failed the final examination and asked him to leave. When plaintiff asked to see his results, Ms. Pizzingrillo told him he had to contact Chase headquarters to obtain his results. Plaintiff alleges that he was the only " older" person at the training, and that the African-American trainees were given special assistance

Not Reported in F.Supp.2d    Page 2
Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

which was not offered to plaintiff. Plaintiff further alleges that he went to see the manager of the Long Beach Branch approximately two weeks later and was received by defendant Jane Doe # 2 who, acting bewildered, referred him to defendant Jane Doe # 3, who appeared "completely alarmed by his presence" because she moved bundles of cash away from him to the far side of her table.

> FN1. In this section of his complaint, plaintiff makes allegations concerning a sequence of alleged discrimination occurring in December 1998 and January 1998. Because the complaint states the allegations in sequential narrative form, it is likely that plaintiff's allegations refer either to December 1997 and January 1998 (as is assumed by the defendants in their motion papers), or to December 1998 and January 1999. Because all of plaintiff's Title VII and ADEA allegations arising out of events in 1997, 1998 or 1999 would be time-barred, the remainder of this opinion gives plaintiff the benefit of the more recent dates, and thus assumes that plaintiff's second set of allegations refer to events in December 1998 and January 1999.

For a third incident of discrimination, plaintiff alleges that he again applied for work at Chase on January 26, 2001 and passed the exams given to him. Plaintiff alleges that he subsequently returned for an interview with Chase employee Miriam Morales, who "treated him with contempt." Plaintiff alleges that Ms. Morales told plaintiff that she could not hire him because he had not mentioned on his application that he had been previously employed by Chase. Plaintiff alleges that his explanation that he had not realized that his brief training program in January 1998 amounted to employment was rebuffed by Ms. Morales.

On February 7, 2001, plaintiff filed a claim with the Equal Employment Opportunity Commission (EEOC) complaining that Chase's failure to hire him in January of 2001 was a result of discrimination based upon his age, race and national origin. The EEOC issued a Right to Sue letter to plaintiff on February 15, 2001. Plaintiff filed the original complaint in this lawsuit on May 22, 2001, naming only Chase as the defendant and alleging discrimination based only upon his January 2001 employment application. On August 27, 2001, plaintiff filed an amended complaint adding defendant Carol A. Pizzigrillo and four other unidentified individual defendants, and adding allegations concerning his employment applications in 1992 through 1995 and in December 1998. The amended complaint also added causes of action for negligent and emotional infliction of emotional distress under common law and the Jones Act, deceptive advertising, and entrapment to plaintiff's original discrimination claims under Title VII and the ADEA.

II. *Discussion*

A. *12(b)(6) Standards*

A district judge may dismiss a complaint challenged by a Rule 12(b)(6) motion, Fed.R.Civ.P. 12(b)(6), only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *D'Alessio v. New York Stock Exchange, Inc.,* 258 F.3d 93, 99 (2d Cir.1991). Thus, for the purposes of this motion, all material allegations of the complaint are to be accepted as true, and all reasonable inferences are to be drawn in favor of the nonmoving party. *Id.* Moreover, "it is well settled that pro se litigants generally are entitled to a liberal construction of their pleadings, which should be read ' to raise the strongest arguments that they suggest.' " *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)).

B. *Plaintiff's Title VII and ADEA Claims for Discrimination Prior to April 2000 Are Time-Barred*

*3 In his amended complaint, plaintiff brings discrimination claims under Title VII and the ADEA arising out of his employment applications with Chase in 1992 through 1995, in December 1998, and in January 2001. In order for a plaintiff to bring a civil lawsuit for employment discrimination under Title VII or the ADEA, he must first timely file a charge of discrimination with the EEOC. 29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5; *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001); *Tewksbury v. Ottaway Newspapers,* 192 F.3d 322, 325 (2d Cir.1999). In a state, such as New York, which authorizes an agency to enforce the state's own laws forbidding discrimination, such charge must be filed with the EEOC within 300 days after the unlawful discrimination occurred or within 30 days after the plaintiff receives notice of the termination of state proceedings, whichever is earlier. 29 U.S.C. § 626(d)(2); 42 U.S.C. § 2000e-5(e)(1).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

According to plaintiff's allegations, he filed his only complaint with the EEOC on February 7, 2001. Applying the limitations periods outlined above, I may only consider plaintiff's claims involving discrimination which occurred within 300 days before February 7, 2001-that is, actions that occurred on or after April 13, 2000. Therefore, all of plaintiff's claims in his amended complaint arising out of his employment applications with Chase in 1992-1995 and in December 1998 and January 1999 are stricken, and the causes of action based upon them are dismissed. Chase's allegedly discriminatory decision to deny plaintiff employment had been made and communicated to plaintiff in each of these alleged incidents long before April 13, 2000. *See Delaware State College v. Ricks,* 499 U.S. 250, 262 (1980) (discrimination occurs when discriminatory employment decision is made by employer and communicated to plaintiff). I therefore dismiss all of plaintiff's Title VII and ADEA claims based on events which allegedly occurred before April 13, 2000.

### C. Individual Defendants Not Liable for Discrimination

Plaintiff's discrimination claims under Title VII and the ADEA cannot be maintained against the individual Chase employees named as defendants. Neither Title VII nor the ADEA authorizes discrimination suits against individual employees. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1314 (2d Cir.1995) (individual employees are not subject to civil liability for discrimination under Title VII); *Boise v. Boufford,* 127 F.Supp.2d 467, 472 (S.D.N.Y.2001) (applying *Tomka*'s reasoning to the ADEA and citing cases). Therefore, all of plaintiff's claims against individual defendants Jane Doe # 1, Jane Doe # 2, Jane Doe # 3, John Doe # 1, and Carol Pizzingrillo, alleging discrimination on the basis of race, national origin, and age under Title VII and the ADEA are dismissed.

### D. Plaintiff's Claims for Infliction of Emotional Distress Are Untenable

#### 1. Intentional Infliction of Emotional Distress

*4 Even construing the plaintiff's original and amended complaints leniently, plaintiff's allegations do not state a cause of action for intentional infliction of emotional distress. To make out a claim for intentional infliction of emotional distress under New York law, plaintiff must allege: " (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." *Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 121 (1993). Plaintiff's amended complaint fails to adequately allege the first element; " extreme or outrageous conduct" on the part of Chase or its employees.

Because the threshold of " extreme and outrageous conduct" is so high, the pleading requirements for intentional infliction of emotional distress are difficult to satisfy. *Id.*; *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 303 (1983). Indeed, the New York Court of Appeals has recognized that " [l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, as utterly intolerable in a civilized community." *Murphy,* 58 N.Y.2d at 303 (quoting Restatement (Second) of Torts § 46[1], cmt. d).

Here, the conduct alleged against Chase employees and agents does not satisfy this stringent standard. In conjunction with his employment applications in 1992 through 1995 plaintiff was interviewed twice by a woman who, he claims, exhibited an " odious demeanor." In conjunction with his employment application at the end of 1998, plaintiff alleges that he was dismissed from the training program by Chase trainer Carol Pizzingrillo because she informed him that he had failed a test. Plaintiff further alleges that when he returned for training one unidentified manager acted " bewildered" to see him, and another unidentified employee assigned to train him was " completely alarmed by [plaintiffs'] presence" and moved bundles of cash away from him to the other side of her table. Finally, plaintiff alleged that Chase employee Miriam Morales treated him with " contempt" when he was interviewed again in January 2001. After telling plaintiff to wait outside her office for half an hour, Ms. Morales told plaintiff she could not hire him because he had neglected to mention that he had been previously employed by Chase. She refused to change her mind after plaintiff explained that he did not understand that his brief stint in a Chase training program did not count as previous employment.

The alleged behavior of Chase employees does not exceed the bounds of civilized decency. The tort of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

intentional infliction of emotional distress is not adequately alleged. See *Murphy v. American Home Prods. Corp.,* 112 Misc.2d 507, 508-09 (Sup.Ct.N.Y.Cty.), *modified* 88 A.D.2d 870 (1st Dep't 1982), *modified* 58 N.Y.2d 293 (1983) (describing employer's conduct in discharge of plaintiff employee which the Court of Appeals held inadequately outrageous as a matter of law). Plaintiff's claims for intentional infliction of emotional distress are therefore dismissed.[FN2]

> FN2. To the extent that any of plaintiff's claims for intentional or negligent infliction of emotional distress arise out of events occurring before May 22, 1998 they would also be time-barred by the applicable three-year New York statute of limitations. N.Y. CPLR § 214 (McKinney's 1990).

#### 2. Negligent Infliction of Emotional Distress

*5 In New York, a plaintiff cannot recover on a claim for negligent infliction of emotional distress unless the defendant's negligence unreasonably threatened plaintiff's physical safety, or, in other words, unless plaintiff was in the " zone of danger." *DeAguiar v. County of Suffolk,* 289 A.D.2d 280, 281 (2d Dep't 2001); *Doe v. Archbishop Stepinac High School,* 286 A.D.2d 478, 479 (2d Dep't 2001). Plaintiff does not allege that his physical safety was in any way threatened by the defendants' negligence and therefore his negligent infliction of emotional distress claims are dismissed.

### E. *Plaintiff Fails to State a Claim for Deceptive Advertising*

In his amended complaint, plaintiff adds a claim of " deceptive advertising" against Chase to his employment discrimination and tort claims. Presumably, plaintiff is arguing that Chase's advertisements seeking prospective employment applicants were false because he responded to such advertisements several times and was not hired. Plaintiff does not, however, allege consumer-oriented conduct required to state a claim for false advertising under New York Law. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25 (1995); N.Y. Gen. Bus. Law §§ 349, 350 (McKinney's 1990). His deceptive advertising claims are therefore dismissed.

### F. *Plaintiff Fails to State Claims for Entrapment or Under the Jones Act*

In his amended complaint, plaintiff also appends conclusory allegations of entrapment and of intentional and negligent infliction of emotional distress under the Jones Act. Neither claim is applicable to this lawsuit. Under New York law, entrapment is a defense only to criminal charges and has no applicability as an affirmative civil claim. Similarly inapplicable, the Jones Act only involves maritime tort claims. Plaintiff's entrapment and Jones Act claims are therefore also dismissed.

### III. *Conclusion*

For the forgoing reasons, plaintiff's claims arising out of alleged occurrences before April 13, 2000, and all of plaintiff's claims against the five individual defendants are dismissed. Plaintiff's claims for intentional and negligent infliction of emotional distress, deceptive advertising, entrapment, and all claims under the Jones Act are likewise dismissed.

Therefore, Plaintiff's only remaining claims are those alleged in his original complaint under Title VII and the ADEA alleging that Chase discriminated against him on the basis of race, national origin, and age when it refused to hire him in January 2001. The amended complaint is stricken.

The parties shall appear for a case management conference on Friday, May 3 at 9:30 a.m. in Courtroom 14D, in the United States Courthouse at 500 Pearl Street, New York, New York.

SO ORDERED.

S.D.N.Y.,2002.
Grasso v. Chase Manhattan Bank
Not Reported in F.Supp.2d, 2002 WL 575667 (S.D.N.Y.)

END OF DOCUMENT