Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

▷

Costanzo v. U.S. Postal Service
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Elizabeth COSTANZO, Plaintiff,
v.
THE UNITED STATES POSTAL SERVICE, John
E. Potter, Postmaster General, Defendants.
**No. 00 Civ. 5044(NRB).**

March 31, 2003.

Female federal employee brought action against her
employer alleging gender discrimination. Upon
employer's summary judgment motion, the District
Court, Buchwald, J., held that: (1) claims concerning
discrete acts as to which employee failed to contact
an Equal Opportunity Employment (EEO) counselor
within 45 days of their occurrence were time-barred,
and (2) no acts of discrimination against female
federal employee, constituting a hostile work
environment or otherwise, occurred within the
statutory filing period or thereafter.

Motion granted.
West Headnotes
**[1] Civil Rights 78 ⊂⊃1505(7)**

78 Civil Rights
   78IV Remedies Under Federal Employment
Discrimination Statutes
     78k1503 Administrative Agencies and
Proceedings
       78k1505 Time for Proceedings; Limitations
        78k1505(7) k. Continuing Violations;
Serial, Ongoing, or Related Acts. Most Cited Cases
   (Formerly 78k342)
To the extent that federal employee's employment
discrimination complaint concerned discrete acts of
alleged discrimination, as opposed to those that were
allegedly part an ongoing hostile work environment,
occurring before 45 day cut-off date, they could not
be converted into a single unlawful practice for
purposes of timely filing; thus claims concerning
discrete acts as to which employee failed to contact
an Equal Opportunity Employment (EEO) counselor
within 45 days of their occurrence were time-barred.
29 C.F.R. § 1614.105(a).

**[2] Civil Rights 78 ⊂⊃1175**

78 Civil Rights
   78II Employment Practices
     78k1164 Sex Discrimination in General
       78k1175 k. Compensation; Comparable
Worth. Most Cited Cases
   (Formerly 78k161)

**Civil Rights 78 ⊂⊃1185**

78 Civil Rights
   78II Employment Practices
     78k1181 Sexual Harassment; Work
Environment
       78k1185 k. Hostile Environment; Severity,
Pervasiveness, and Frequency. Most Cited Cases
   (Formerly 78k167)
No acts of discrimination against female federal
employee, constituting a hostile work environment or
otherwise, occurred within the statutory filing period
or thereafter; the two males hired with higher salary
and benefits were hired for a different program and
had substantially different qualifications from
employee, various other allegedly discriminatory acts
were not attributable to employee's employer, and a
number of relatively minor and seemingly unrelated
incidents did not amount to either discrete acts of
discrimination or a hostile work environment either
individually or in combination. Civil Rights Act of
1964, § 701 et seq., as amended, 42 U.S.C.A. §
2000e et seq.

**[3] Civil Rights 78 ⊂⊃1505(7)**

78 Civil Rights
   78IV Remedies Under Federal Employment
Discrimination Statutes
     78k1503 Administrative Agencies and
Proceedings
       78k1505 Time for Proceedings; Limitations
        78k1505(7) k. Continuing Violations;
Serial, Ongoing, or Related Acts. Most Cited Cases
   (Formerly 78k342)
Record did not support a link between acts allegedly
occurring within the limitation period and others
predating the period such as would warrant a finding
of any actionable hostile work environment
straddling the cut-off date; group of relatively

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2

Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

isolated and unrelated incidents of potentially offensive conduct, such as an occasion on which female federal employee claimed she was criticized by being " called dumb" in front of a group of other co-workers and another on which she was allegedly told that she was setting her expectations too high for herself, were neither continuous nor concerted, and did not constitute a basis for claim that employee experienced a pervasive, hostile work environment for more than a year before the statutory cut-off date, and none of the events allegedly occurring after the statutory cut-off date had any relation to employee's allegations concerning events before her transfer. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.; 29 C.F.R. § 1614.105(a).

**[4] Labor and Employment 231H ⫞2463**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(C) Equal Pay
            231Hk2460 Discrimination in General
                231Hk2463 k. Equal Work; Skill, Effort, and Responsibility. Most Cited Cases
(Formerly 232Ak1333 Labor Relations)
Equal Pay Act claim could not be established by female federal employee in view of undisputed differences in qualifications between her and the two male employee allegedly receiving greater pay. Fair Labor Standards Act of 1938, § 6(d), 29 U.S.C.A. § 206(d).

MEMORANDUM AND ORDER
BUCHWALD, J.
*1 Plaintiff Elizabeth Costanzo brings this lawsuit under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e-2000e-16(a), hereinafter " Title VII" ), the Equal Pay Act (29 U.S.C. § 206(d), hereinafter " EPA" ), and the Fair Labor Standards Act (29 U.S.C. § 207), alleging gender discrimination by her employer, the United States Postal Service (USPS). Now pending before the Court is defendants' [FN1] summary judgment motion arguing that: (1) the majority of plaintiff's claims are time-barred because, by failing to contact an Equal Opportunity Employment (EEO) counselor within 45 days of their occurrence, she did not appropriately exhaust her administrative remedies with respect to those claims; (2) plaintiff failed to exhaust certain of her claims by deliberately choosing not to raise them during the EEO process; (3) plaintiff cannot make out a *prima facie* case for discrimination; (4) plaintiff cannot

make out a *prima facie* EPA claim because she and the male employees to whom she compares herself were not similarly situated; and (5) plaintiff's FLSA claim is time-barred. For the reasons set forth below, defendants' motion is granted and the case is dismissed in its entirety.

> FN1. Pursuant to Federal Rule of Civil Procedure 25(d)(1), the current Postmaster General of the United States Postal Service, John E. Potter, has been substituted as a defendant for William H. Henderson, who is named in plaintiff's Second Amended Complaint.

A. Undisputed Facts

The following undisputed facts are taken from the supporting evidence to defendants' statement of undisputed material facts submitted pursuant to Local Rule 56.1.[FN2]

> FN2. We rely on defendants' 56.1 statement since plaintiff has failed to comply with Local Rule 56.1. *See* Local Rule 56.1 of the Southern & Eastern Districts of New York; Fed. R. Civ. P. 56; *See also Gubitosi v. Kapica* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (accepting as true the facts alleged in the defendant's statement of undisputed facts because the plaintiff failed to file a responsive statement); *Dusanenko v. Maloney,* 726 F.2d 82, 84 (2d Cir.1984) (holding that the facts set forth in defendant's 56.1 statement-then a local rule 3(g) statement-were properly admitted because the plaintiff failed to controvert those facts with affidavits or other evidence). Plaintiff's counsel's " Rule 56.1 Statement" is limited to one paragraph, which makes no reference to any facts and instead contains conclusory statements, such as " [t]he issues to be tried are whether or not the actions of the defendant as alleged by Plaintiff Elizabeth Costanzo create triable issues of fact." Opp'n Br. at 3. As discussed further below, those conclusory allegations cannot create a genuine issue of material fact for trial. *See* Fed.R.Civ.P. 56(c) and (e) (response to properly supported summary judgment motion must be by affidavits made on personal knowledge, depositions, answers to interrogatories and admissions on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3

Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

file). It should also be noted that, despite the " extensive discovery" conducted in this case, *see* Opp'n Br. at 2, plaintiff's counsel has neither submitted nor referenced any evidence to support her opposition to the pending motion. In fact, the only support available on plaintiff's behalf-and which we later consider-is an affidavit she submitted during a discovery dispute at a much earlier stage of the lawsuit. *See* May 18, 2001 Costanzo Affidavit (hereinafter " Costanzo Aff." ). Particularly lacking, since plaintiff claims that many of the miscellaneous acts of alleged discrimination and harassment about which she complains took place in front of multiple co-workers, is any testimonial evidence from these co-workers in the form of affidavits or deposition testimony.

Plaintiff was hired in 1996 as part of a nationwide USPS program of hiring independent contractors-referred to as Contracts Fraud Analysts (" CFAs" )-to assist the Postal Service and U.S. Postal Inspection Service in investigating worker's compensation fraud. *See* Decl. of Anita L. Davidson (hereinafter " Davidson Decl." ) at ¶ 4. Her contracts, which were uniform personal services contracts identical to hundreds used by USPS nationwide that contained no unique clauses aside from title, job description, and salary, were initially funded directly by the Postal Service (as opposed to the Postal Inspection Service) and were renewed continually until December 31, 1999. *See* Decl. of Michael Irenski (hereinafter " Irenski Decl." ) at ¶¶ 2-3; Decl. of Thomas Kelly (hereinafter " Kelly Decl." ) at ¶ 9. Prior to working for USPS, plaintiff had no law enforcement experience. *See* Kelly Decl. at ¶ 9. Although plaintiff was one of two CFAs initially hired by the USPS New York Metro Division, *see id.,* she was the only CFA on staff from November 1997 until July 1999. *See id.* at ¶ 38. Later, two additional male CFAs, each with extensive law enforcement experience, were hired as part of a second CFA program funded directly by the Postal Inspection Service. *See id.* ¶¶ 22-25. Plaintiff eventually became a part of this second CFA program from January through December 2000. *See id.*

During her employment, the full scope of plaintiff's contractual relationship with USPS and the work she performed as a CFA was established by the " Operating Guideline Procedures for Contract Fraud

Analysts," which were revised in September 1997 to clarify *inter alia* that CFAs were not permitted to operate government vehicles. *See* Davidson Decl. at ¶¶ 5-6 and Exs. A & B (guidelines); Kelly Decl. at ¶ 11 and Exs. B & D (guidelines). Plaintiff's supervisors were informed of the motor vehicle prohibition in November 1997 and advised plaintiff, who had previously been permitted to use a government vehicle to conduct surveillance, that she could no longer do so. *See* Kelly Decl. at ¶ 11.

**\*2** When plaintiff first began working as a CFA, she was assigned to the Fraudulent Workers' Compensation Team (" FWC team" ) of the New York Metro Division of the Postal Inspection Service, which was actually comprised of two separate teams consisting of one team leader and approximately five inspectors investigating workers' compensation fraud by current and former postal service employees (sometimes in conjunction with one another). *See* Kelly Decl. at ¶¶ 1-3, 7-10. One of the two FWC teams was headed by Inspector Frank Citera; the other was headed by Inspector Thomas Kelly. *Id.* at ¶¶ 1-2. At various times, plaintiff was worked with each of the two FWC teams.

In November of 1997, plaintiff was transferred from the FWC team to assist the Inspection Service's Audit Team, headed by a new supervisor, Inspector Jim Burton, in the performance of field work that was part of an audit of the New York Metro Area's Office of Workers' Compensation Program. *See* Decl. of James Burton (hereinafter " Burtun Decl." ) at ¶ 3-4; Kelly Decl. at 13-14. At the time, plaintiff " liked the work," which required going to various workers' compensation offices to review files and interview employees, and " thought it might help [her] down the road for [her] career," Transcript of Deposition of Elizabeth Costanzo, Ex. B to July 29, 2002 Binder Decl. (hereinafter " Costanzo Depo." ), at 195 (lines 6-13).

Soon after her assignment to the audit team, plaintiff became involved sexually with Inspector Richard Vignogna, who was plaintiff's co-worker on the team but not her supervisor. *See* Kelly Decl. at ¶ 14. Having learned of the romantic relationship, knowing that Inspector Vignogna was married at the time, and having considered that it therefore might be inappropriate for plaintiff to accompany the Audit team to an audit being planned for Puerto Rico during January 1998, Inspectors Citera and Kelly advised their superior of the relationship. *See id.* Plaintiff,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4

Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

however, was ultimately permitted to participate in the Puerto Rico audit. *See* Burton Decl. at ¶ 15.

In March 1998, the Audit team's field work concluded, and therefore it no longer required plaintiff's assistance. *See* Burton Decl. at ¶ 7. Plaintiff was reassigned to the New York Metro Area Injury Compensation Office (ICO) in response to several requests for assistance from the ICO. *See* Kelly Decl. at ¶¶ 16-17; Decl. of John O'Connor (hereinafter " O'Connor Decl." ) at ¶ 3. At the ICO, plaintiff once again had a new supervisor, Inspector John O'Connor. *See id.* Plaintiff's work at the ICO included researching medical records and tax records housed at a Manhattan office of the Department of Labor (which maintains workers' compensation records for federal employees) in search of potential workers' compensation fraud. *See* O'Connor Decl. at ¶ 2; Kelly Decl. at ¶ 3. To this end, plaintiff " [g]ave possible fraud cases to the inspectors, profile[d] any cases, and answer[ed] any questions in the New York Metro area for both the postal service and the inspection service." Costanzo Depo. at 99 (lines 17-21).

**\*3** During her assignment to the ICO, plaintiff took and failed the initial entrance examination to join the Postal Inspection Service. *See* Declaration of Beverly Dassen at ¶ 4 and Exs. A-B.

Plaintiff's final USPS assignment involved returning to the FWC team after the Postal Service's CFA program was phased out and replaced by a CFA program funded directly by the Inspection Service. The Inspection Service assumed responsibility for the CFA Program in April 1999, meaning that after that point new CFAs were hired under the more stringent requirements of the Inspection Service program and paid from the Inspection Service's budget, as opposed to the Postal Service's budget (as was plaintiff). *See* Decl. of Paulette Jones (hereinafter " Jones Decl." ) at ¶ 4. Effective December 31, 1999, the Postal Service ceased completely its direct funding of the CFA program and all applicants to the Inspection Service's program-including all those, like plaintiff, who were formerly independent contractors funded by the Postal Service program-were required to go through the Inspection Service's hiring process and meet the more stringent requirements set forth in the CFA guidelines effective at the time of the application. *See* Jones Decl at ¶ 4; Kelly Decl. at ¶ 28. In response to inquiries about her contract " renewal," Plaintiff was advised on October 22, 1999 and again on December 22, 1999 that she could seek

a contract under the Inspection Service CFA Program. *See* Kelly Decl. at ¶¶ 29-32 and Exs. A-D. After a three week unpaid work hiatus during which she her application to the Inspection Service CFA Program was pending, plaintiff was hired for the Inspection Service program on January 24, 2000 and given a raise from $20.50 per hour to $26.00 per hour. *See id.* at ¶ 33. She returned to the FWC team, where she worked until she left the USPS in December 2000.

While plaintiff was the only CFA in the New York Metro Division for most of her USPS tenure, two other male CFAs were hired under the auspices of the Inspection Service program in 1999 and subsequently sent to training sessions in Maryland held that Fall for all new CFAs hired under the Inspection Service program. *See id.* ¶¶ 22-27. When Inspector Kelly inquired about the availability of such training for plaintiff after she too joined the Inspection Service program, he was informed that no training was available because there were too few new CFAs at the time. *See id.* at ¶ 35. Commensurate with their substantial law enforcement experience, since both were in the latter stages of law enforcement careers, the new CFAs hired under the Inspection Service program were each paid $36 per hour. *See id.* at ¶¶ 22, 24.

### B. Summary Judgment Standard

Summary judgment is properly granted " ' if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." ' *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). The Federal Rules of Civil Procedure mandate the entry of summary judgment " against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*4** In reviewing the record, we must assess the evidence " in the light most favorable to the non-movant and ... draw all reasonable inferences in [her] favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990). The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 5

Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

for summary judgment because " ' [m]ere conclusory allegations or denials' in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Moreover, a non-moving party may not " rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U .S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995) (finding that mere speculation or conjecture as to the true nature of the facts cannot overcome a motion for summary judgment; *Ricks v. Conde Nast Publications, Inc.,* 92 F.Supp.2d 338, 343-44 (S.D.N.Y.2000) (same). Rather, in order to defeat a summary judgment motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is " genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (internal quotation omitted).

These principles apply no less to discrimination cases than to other areas of litigation. *See, e.g., Dister v. Continental Group, Inc.,* 850 F.2d 1108, 1114 (1988). Indeed, it is now " beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001).

C. Timeliness Issue Concerning Plaintiff's Claims

Defendants contend in support of their motion for summary judgment that plaintiff failed to exhaust her administrative remedies in a timely manner with respect to a number of her discrimination claims because she failed to contact an EEO counselor within 45 days of the alleged discriminatory conduct and thereby failed to comply with the relevant statute of limitations.

The legal context for defendants' contention is well-settled. As Title VII provides the exclusive remedy for a federal employee suing the Government for discrimination, *Brown v. General Services Admin. .,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), a plaintiff must comply with the Act's requirement that an employee exhaust administrative remedies in a timely manner. *Pauling v. Secretary of the Department of the Interior,* 160 F.3d 133 (2d Cir.1998). To do so, employees who feel that they have been discriminated against must endeavor to informally resolve the issue by consulting with an Equal Opportunity Employment counselor prior to filing an administrative complaint. 29 C.F.R. § 1614.105(a). Federal employees must also comply with the requirement, directly relevant here, that " [a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F .R. § 1614.105(a)(1).FN3 If the issue is not resolved by informal counseling, then the employee may, within 15 days thereafter, file a formal administrative complaint. 29 C.F.R. § 1614.106(a) and (b). An employee who timely files a formal administrative complaint may file a civil action in court within 90 days of receipt of notice of the final administrative decision or after 180 days if there has been no administrative decision. *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.408(a) and (b).

> FN3. Both parties agree that the 45 day filing period for federal employees is applicable here. *See* Opp'n Br. at 5.

*5 Compliance with these deadlines " is a condition of the waiver of sovereign immunity and thus must be strictly construed." *Irwin v. Department of Veteran Affairs,* 498 U.S. 89, 94, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). Hence, the 45 day period " functions as a statute of limitations in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court." *Quinn v.. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (citations omitted). It is defendants' burden to prove that plaintiff did not timely exhaust her administrative remedies. *German v. Pena,* 97 Civ. 6691, 2000 WL 278080, at *3 (S.D.N.Y. Mar.13, 2000).

[1] It is undisputed that plaintiff first contacted the EEOC on June 24, 1999, making the cut-off date for the statutory filing period May 9, 1999, which is well into the portion of her USPS employment spent at the ICO and considerably more than 45 days after many

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 6

Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

of the allegations in her complaint. To the extent that plaintiff's complaint concerns " discrete" acts of alleged discrimination (as opposed to those that are allegedly part an ongoing hostile work environment) occurring before the cut-off date, they cannot be converted into a single unlawful practice for purposes of timely filing, *see National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002) (hereinafter " *Morgan"* ), and thus are " not actionable if time barred, *even when they are related to acts alleged in timely filed charges .*" *Id.* at 2072 (emphasis added). Thus, plaintiff's claims concerning discrete acts prior to May 9, 1999 must all be dismissed under *Morgan* as time-barred.

Well-settled law in this circuit under the " continuing violation" doctrine, predating the *Morgan* decision, dictates that " discrete acts" include allegedly discriminatory transfers, job assignments, and non-promotions, and failures to compensate adequately.[FN4] *See Gross v. National Broadcasting Co., Inc.,* 232 F.Supp.2d 58, 68 S.D.N.Y.2002) (" [A]lleged failures to compensate adequately, transfers, job assignments and [non-]promotions cannot form the basis for a continuing violation claim" ); *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997) (" [A] job transfer, or discontinuance of a particular job assignment, are not acts of a ' continuing' nature." (internal quotation marks and citation omitted)); *Crosland v. City of New York,* 140 F.Supp.2d 300, 308 (S.D.N.Y.2001) (" It is well-settled that transfers, demotions, failure to compensate adequately, and failure to promote are all discrete acts which do not constitute a continuing violation." ). Additionally, a plaintiff cannot circumvent the statute of limitations by simply claiming that the effects of such discrete acts continued into the filing period. *See Lightfoot,* 110 F.3d at 907 (2d Cir.1997) (" A continuing violation is not established merely because an employee continues to feel the effects of a discriminatory act on the part of the employer. To hold otherwise would render meaningless the time limitations imposed on discrimination actions." ).

> FN4. In *Morgan,* the Supreme Court described " discrete" acts of discrimination as those that one would consider to have " occurred," as that term is used in Title VII, " on the day that [they] happened." *Morgan* at 2070.

*6 *Morgan,* however, mandates a different exhaustion inquiry for Title VII claims involving a hostile work environment. Because " a hostile work environment claim is comprised of a series of separate acts that collectively constitute one ' unlawful employment practice," ' *Morgan* at 2074 (citation omitted), such a claim will not be time-barred merely because a portion of the individual acts that comprise the hostile work environment took place outside the 45 day statutory filing period. *Id.* The statute of limitations is not discarded entirely in such cases. Rather, unlike cases of discrete acts of discrimination, in which the entire act must have occurred within the statutory period, acts outside the statutory period may be considered when they are part of a hostile work environment that allegedly occurred at least partly within the statutory period. *Id.* (" Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability." ). Presumably, events subsequent to commencement of the EEO process may also preserve a hostile work environment claim if they can be fairly characterized as part of the same single, continuing act of discrimination. *See id.* (" [A]n unlawful employment practice has ' occurred,' even if it is still ongoing. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole" ); *See also id.* at 2075 (describing various hypothetical scenarios in which a hostile work environment claims would be actionable). Additionally, *Morgan* requires dismissal even if plaintiff experienced a hostile work environment at some previous point, as long as no hostile work environment occurred after the statutory filing period commenced. *See id.* at 2075.

In order to survive a summary judgment motion on a hostile work environment claim, a plaintiff must produce evidence that " the workplace [was] permeated with ' discriminatory intimidation, ridicule, and insult,' that [was] ' sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (quoting *Harris v. Forklift Systems, Ubc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations omitted)); *Morgan* at 2074 (same). Courts examining hostile work environment claims look to " all the circumstances," including " the frequency of the discriminatory conduct; its severity; whether it is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 7
Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." _Harris,_ 510 U.S. at 23; _Morgan_ at 2074 (quoting _Harris_ ). As a result, " simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ' terms and conditions of employment." ' _Clark County School District v. Breeden._ 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). A plaintiff must also demonstrate that a series of incidents allegedly creating a hostile work environment were " sufficiently continuous and concerted" to alter the conditions of his or her working environment. _See Cruz,_ 202 F.3d at 570 (quoting _Perry v. Ethan Allen Inc.,_ 115 F.3d 143, 149 (2d Cir.1997 _quoting Carrero v. New York City Housing Authority,_ 890 F.2d 569, 577 (2d Cir.1989)).

**\*7** With these legal principles in mind, we next turn to plaintiff's allegations.

### D. Plaintiff's Allegations

Plaintiff's Title VII claim centers on an incident she alleges occurred in October 1997 during her original assignment with the FWC team that she claims " created a hostile work environment" and altered her working conditions at USPS. _See_ Opp'n Br. at 16. She alleges that she was seated in a car and approached by Inspector Kelly, who then leaned into the car and slowly " eye-balled" her body. _See_ Compl. at ¶¶ 40-41. According to plaintiff, when she uncomfortably asked Inspector Kelly how his weekend was, he replied " very wet" while staring at her groin. _Id._ ¶¶ 42-43. Plaintiff complained informally to Inspector Citera, the other team supervisor, about the comment, _see id._ at ¶ 45-47, and claims that she suffered retaliation at various times during her USPS employment as a result, including her transfer to the Audit Team (despite her apparent contentment with the work at the time the transfer occurred). Plaintiff further alleges that she was subjected to an " extremely hostile work environment" during her assignment to the Audit Team from November 1997 through March 1998, _see_ Compl. at ¶ 55, particularly in her relations with Inspector Vignogna both during and after their sexual liaison.[FN5] _See_ Compl. at ¶¶ 59-68. Other allegations of retaliation, most of which plaintiff does not claim took place within the statutory filing period, include: her March 1998 transfer to the ICO (with corresponding work assignments she found

inappropriate thereafter), _see_ Compl. at ¶ 80; loss of her use of a government vehicle and parking privileges in 1997 and 1998, _see_ Compl. at ¶ 62; Costanzo Aff. at ¶ 62; being told she failed the Inspection Service entrance exam in 1998 (which she believes was false), _see_ Costanzo Aff. at ¶ 42; allegedly being paid unequal wages to male CFAs hired in 1999 when believes that she was equally qualified, _see_ Compl. at ¶ 155; changed contractual terms starting in 1998 providing for semiannual renewals (as opposed to annual ones), _see_ Compl. at ¶ 64; exclusion from certain meetings and training sessions while with the ICO in 1999, _see_ Costanzo Aff. at ¶¶ 35, 39, 43, 48, 63; and having to reapply for the Inspection Service CFA Program in January 2000, _see_ Compl. at ¶¶ 145-150.[FN6]

> FN5. According to plaintiff, Inspector Vignogna initially told her that he was single and their relationship became abusive around the time that she ended it in January 1998. _See_ Compl. at ¶ 66. Plaintiff's complaint, though not her later affidavit, further claims that Inspector Vignogna subsequently made her fear for her safety and threatened to ruin her career, causing her to continue to give in to his sexual demands. _See id._ at ¶ 59, 66-68. Apparently on the advice of counsel, plaintiff's allegations concerning Inspector Vignogna were not included in her EEO complaint. _See_ Costanzo Depo. at 710-711. However, we do not reach the issue of whether it affects her ability to raise them here.

> FN6. As we will discuss further below, plaintiff cannot sustain any of these allegations of retaliation in light of the undisputed facts submitted by defendants indicating that none of these personnel actions were either discriminatory or retaliatory.

Plaintiff's complaint (although not her motion papers) also recounts an array of miscellaneous acts taken by variety of people, or in several cases by persons unknown, during the various stages of her career at USPS that she attributes to retaliation and harassment. We will not enumerate these claims, but rather will address them as they become analytically relevant.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8

Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

E. Discussion

Evaluating plaintiff's Title VII claim in light of the undisputed facts, we find that no acts of discrimination, constituting a hostile work environment or otherwise, occurred within the statutory filing period or thereafter. Moreover, even viewing plaintiff's post-May 9, 1999 allegations in a broader context, we find that none of them can be reasonably considered part of a hostile work environment that began before the statutory period and extended into it. We therefore grant defendants' motion for summary judgment because all of plaintiff's pre-May 9, 1999 claims must be dismissed as untimely and her post-May 9, 1999 claims are wholly insufficient to support a claim of discrimination.[FN7]

FN7. While it is true that we must assess the evidence in the light most favorable to the plaintiff, this does not absolve her of the obligation to affirmatively set forth facts showing that there is a genuine issue for trial. Plaintiff's submission in opposition to this motion fails to meet even this minimal evidentiary requirement. Although plaintiff's motion papers make the unsupported assertion that " there is ample evidence that the allegations of discrimination are severe and pervasive," Opp'n Br. at 8, they point to no specific evidence of the hostile work environment she alleges. As we noted earlier, such conclusory allegations in legal memoranda are legally insufficient to defeat a motion for summary judgment, especially in a case such as this where plaintiff has been given an opportunity to conduct " extensive discovery." Opp'n Br. at 2. Moreover, nothing in *Morgan* eliminates the fundamental requirement that a plaintiff seeking to defeat a motion of summary judgment support her position with admissible evidence.

(1) Acts Within the Statutory Filing Period

*8 [2] Plaintiff claims that she experienced a hostile work environment starting in late-1997 with the alleged " very wet" incident and continuing thereafter at her various subsequent USPS postings into the statutory filing period. However, plaintiff's subjective view that she experienced a hostile work environment is insufficient. The work environment must be objectively hostile-that is, one that " a reasonable person would find hostile or abusive." *Farragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).[FN8] As a review of the record will demonstrate, none of the post-May 9, 1999 allegations can reasonably be considered indicative of a work environment " permeated with discriminatory intimidation, ridicule, and insult" sufficient to make out a hostile work environment claim. For analytic clarity, we group plaintiff's claims these into several categories.

FN8. Plaintiff's brief misstates the law on this issue, arguing that " [s]ince the question of whether a hostile work environment exists is subjective and deals with one's state of mind [*sic* ] we can only look to evidence of Costanzo's mental state." Opp'n. Br. at 8-9.

A first group of plaintiff's claims are simply precluded by the undisputed facts. It is undisputed, for example, that the two male CFAs hired under the auspices of the Inspection Service CFA Program in 1999 were hired for a different program and had substantially different qualifications from plaintiff. *See* Kelly Decl. at ¶ 22. Therefore, she cannot maintain her claim that she was discriminatorily denied the same salary and benefits as these other CFAs. *See* Costanzo Aff. at ¶ 44. *Cf. Shieldkret v. Park Place Entertainment Corp.,* 01 Civ. 0547, 2002 WL 91621, at *3 (S.D.N.Y. Jan.23, 2002) (noting that the Equal Pay Act is not violated when a higher salary is based on an employee's prior work experience); *Milligan v. Citibank, N.A.,* 00 Civ. 2793, 2001 WL 1135943, at *9 (S.D.N.Y. Sept.26, 2001) (dismissing Equal Pay Act claim under the statutory defense of " a differential based on any other factor other than sex" ); *Washington v. Gunter,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) (holding that Title VII incorporates EPA affirmative defenses). Nor can plaintiff sustain her allegation of discrimination for having to reapply for the Inspection Service CFA program after her contract expired in December 1999 when the undisputed facts indicate that all CFAs from the Postal Service Program nationwide were required to re-apply and meet the stricter criteria of the Inspection Service program. *See* Compl. at ¶¶ 145-150; Jones Decl at ¶ 4; Kelly Decl. at ¶ 28. Defendants' undisputed assertion that there was no training available in Maryland at the time plaintiff joined the Inspection Service CFA program because of the relatively few

Not Reported in F.Supp.2d                                                                                                                  Page 9
Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

new hires at that time similarly undermines plaintiff's allegation of discrimination based on the defendants' failure to send her to such training.[FN9] *See* Compl. at ¶ 143; Kelly Decl. at ¶ 35.

> FN9. We also note each of these claims concerns a discrete act of alleged discrimination, rather than claims of a hostile or abusive work environment. As such, under *Morgan* they could not be connected up to claims occurring outside the statutory filing period to make those claims timely even if they were actionable.

Additionally, plaintiff's complaints that she was excluded from various other training sessions and meetings during the statutory time period are precluded by the undisputed facts that, as the only CFA independent contractor, she was not required to attend training sessions that were mandatory for other direct employees and that she was only sent to those training sessions at which her attendance was deemed beneficial to the Postal Service. *See* Costanzo Aff. at ¶¶ 35, 39, 43, 48, 63; O'Connor Decl. at ¶ 4.[FN10] Certainly, such exclusions for articulated business reasons do not amount to pervasive intimidation, ridicule, and insult.

> FN10. It is also doubtful that such exclusions from meetings and training sessions are properly considered adverse employment actions given that lack of any evidence that they materially affected plaintiff's working conditions and/or her prospects for promotion. *Cf. Brennan v. City of White Plains,* 67 F.Supp.2d 362, 374 (S.D.N.Y.1999) (holding that plaintiff's exclusion from meetings she had previously attended was not an adverse employment action when there was insufficient evidence that it affected her working conditions); *Copeland v. Sears, Roebuck & Co.,* 25 F.Supp.2d 412, 417 (S.D.N.Y.1998) (holding that an employer's failure to provide particular training was not an adverse employment action where the training would not qualify the employee for promotion or lead directly to a wage increase).

**\*9** A second category of assertions that may not be the predicate for a Title VII claim are those that are simply not attributable to plaintiff's employer. These include plaintiff's accusations that she twice received pornographic phone numbers on her work pager and once received an obscene message on her home answering machine during August 1999. *See* Costanzo Aff. at ¶¶ 33, 40, 59, 62. There is no evidence on the record to support plaintiff's allegation that the call or pager messages were made by USPS employees. Thus, they cannot be attributed to her employer and cannot form the basis for a discrimination claim. *Cf. Murray v. New York University College of Dentistry,* 57 F.3d 243, 249 (2d. Cir.1995) (noting that a hostile work environment claims requires a plaintiff to establish that " a specific basis exists for imputing the conduct that created the hostile work environment to the employer" ); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (quoting *Murray* ). Also not attributable to her employer for purposes of Title VII, are plaintiff's similarly unsupported claims (appearing only in her complaint) that she was allegedly " surveilled" at her home for two days in October 1999, *see* Compl. at ¶ 137, and that she had the lug nuts removed from the spare tire on her SUV while it was sitting in front of her residence during November 2000. *See* Compl. at ¶ 161.

What remains of the post-May 9, 1999 allegations are a number of relatively minor and seemingly unrelated incidents, which no reasonable juror could find amount to either discrete acts of discrimination or a hostile work environment either individually or in combination. For example, plaintiff alleges that in June 1999 she was introduced by one of her co-workers, Gok Mark, to another person as " the next Paula Jones." *See* Costanzo Aff. at ¶ 58. While plaintiff may have found this comment offensive, such isolated instances of offhand comments by a co-worker do not create a valid Title VII claim unless they are extremely serious-which is clearly not the case here. *See Clark County School District v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000). Other similarly minor and unrelated allegations include plaintiff's being left out of the office phone directory several times, *see* Costanzo Aff. at ¶ 56, having to do heavy lifting after returning from a back injury (no time is specified), *see* Compl. at ¶ 121, losing her desk at the Department of Labor, *see* Compl. at ¶ 131, allegedly receiving her work assignments on short notice, *see* Compl. at ¶ 157, being left off of a meeting agenda, *see* Costanzo Aff. at ¶ 62, being excluded from a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 10
Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

group tour, *see* Compl. at ¶ 136, and having a co-worker tell another that he " won the bet" at her exit interview, *see* Costanzo Aff. at ¶ 64. Considered either alone or in combination, these alleged acts simply cannot be characterized as either continuous or concerted. *See Carrero v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989) (holding that to sustain a hostile work environment claim " [t]he incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive" ); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (" the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were ' sufficiently continuous and concerted' to have altered the conditions of her working environment" ) (quoting *Carrero* ). They are not the type of pervasive intimidation, ridicule, and insult required for a hostile work environment and do not otherwise constitute discrimination. *Cf. Farragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Oncale v. Sundowner Offshore Services,* 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (noting the Supreme Court's desire to set the standards for a valid hostile work environment claim sufficiently high to avoid turning Title VII into a " general civility code" for the workplace).

### (2) Considering Acts Within the Filing Period in Relation to Acts Outside the Period

**\*10** [3] We are mindful both that courts should consider the " all the circumstances" relevant to a hostile work environment claim and that hostile work environment claims are based on the cumulative effects of individual acts and are potentially comprised of single acts of harassment that may not otherwise be actionable on their own, *see Morgan* at 2073. However, even if we expand our discussion to the period preceding May 9, 1999, the record does not support a link between acts allegedly occurring within the limitation period and those predating the period such as would warrant a finding of any actionable hostile work environment straddling the cut-off date.

It is clear from the undisputed facts on the record that, plaintiff did not experience an objectively hostile work environment from at least the time of her transfer to the ICO in March 1998 (over a full year before the statutory cut-off date). Much like the claims she makes concerning post-May 9, 1999

events, after one removes those pre-May 9, 1999 allegations that are either refuted by the undisputed facts (most of which also concern discrete acts that would not properly be considered part of a hostile work environment claim even if they were true) or simply not attributable to defendants, the remainder of plaintiff's allegations concerning her first 13 months at the ICO are too minor, episodic, and unconnected to reasonably be considered indicative of a hostile work environment.

As far as we can discern from the record, plaintiff's chief complaint from March 1998 forward, when her supervisor and co-workers changed as a result of the ICO transfer, concerned ICO work assignments that she perceived as inappropriate. *See* Compl. at ¶¶ 75-76, 80, 87, 111, 114; Costanzo Aff. at ¶¶ 28, 37, 45, 46, 49, 53-55.[FN11] This claim, however, cannot be considered part of an actionable hostile work environment because, at most, it only involves the continuing effects of an allegedly discriminatory transfer (clearly a discrete act), and, as such, it cannot be used to circumvent the statute of limitations. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997).

> FN11. According to plaintiff, when she met with Inspectors Michael Garner and Duane Wesley to discuss her concerns on May 4, 1999 (just before the statutory cut-off date), the three issues she wanted to discuss were threatening phone calls, her failing Inspection Service Entrance Exam Score, and her ICO " segregation" and work assignments. *See* Costanzo Aff. at ¶ 53.

Equally importantly, the undisputed facts refute this and other allegations concerning plaintiff's working conditions at the ICO. Based on undisputed facts, plaintiff's transfer to the ICO occurred because the Audit team's field work had been completed, while the ICO was simultaneously requesting additional assistance, and not because of retaliatory discrimination. *See* Burton Dec;. at ¶ 7; Kelly Decl. at ¶¶ 16-17; O'Connor Decl. at ¶ 3. Moreover, plaintiff's loss of the use of a government vehicle-which actually occurred before the ICO transfer in November 1997-was based on USPS national policy and not discrimination. *See* Davidson Decl. at ¶¶ 5-6; Kelly Decl. at ¶ 11. Plaintiff also cannot continue to claim that her semi-annual contracts were retaliatory in light of the undisputed fact that all her contracts, including the renewal provisions, were uniform

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 11

Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

national personal services contracts used by the Postal Service. *See Irenski Decl.* at ¶¶ 2-3. Finally, plaintiff cannot base a cause of action on being told she had failed the Inspection Service entrance exam in light of the undisputed record evidence indicating that she actually did fail the exam. *See Dassen Decl.* at ¶ 4 and Exs. A-B.

*\*11* Additionally, there is no evidentiary basis to attribute plaintiff's pre-May 9, 1999 complaints about several harassing phone calls to USPS. *See Compl.* at ¶¶ 69, 88, 97, Costanzo Aff. at ¶¶ 33, 44.

As in the case of her post-May 9, 1999 allegations, what remains of plaintiff's allegations of harassment is a group of relatively isolated and unrelated incidents of potentially offensive conduct, such as an occasion on which plaintiff claims she was criticized by being " called dumb" in front of a group of other co-workers and another on which she was allegedly told that she was setting her expectations too high for herself, *see Costanzo Aff.* at ¶¶ 31-53. These episodic acts appear neither continuous nor concerted, and we find among them no reasonable basis for plaintiff to claim that she experienced a pervasive, hostile work environment for more than a year before the statutory cut-off date.[FN12] *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000).

> FN12. Accordingly, we reject plaintiff's contention that this case is similar to *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104 (9th Cir.1998), a Ninth Circuit case that upheld a hostile work environment claim for events straddling the cut-off date when the only act that allegedly took place during the limitations period was a confrontation between the employee and her harassing supervisor. *See Oppn'n Br.* at 7-8. While it is true that plaintiff complained to her supervisors just before and during the statutory filing period, *see Costanzo Aff.* at ¶¶ 47, 53-55, 59, this case is easily distinguishable from *Coeur Rochester.* In *Coeur Rochester,* the plaintiff had been repeatedly ridiculed and demeaned for over a year by the very supervisor whom she confronted with derisive and sexist comments, sometimes broadcast over her company's loud-speaker. Thus, the Ninth Circuit treated the harassing supervisor's derisive response to being confronted by the plaintiff as evidence that this harassment

continued into the limitations period despite the lack of other timely allegations. Here, plaintiff, who does not otherwise have an actionable hostile work environment claim, cannot manufacture one out of the mere fact that she complained to supervisors during the statutory filing period.

Finally, none of the events allegedly occurring after the statutory cut-off date appear to have any relation to plaintiff's allegations concerning events before the ICO transfer. Hence, one might even assume *arguendo* that plaintiff experienced a hostile work environment at some point before her ICO transfer without it affecting the result. Under *Morgan,* " if an act [falling within the statutory filing period] had no relation to the acts [comprising a hostile work environment outside the filing period], or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee can not [*sic* ] recover for the previous acts." *Morgan* 122 S.Ct. 2075. The Supreme Court's reasoning clearly applies here: whatever " abuse" plaintiff received during her assignment to the Audit Team from December 1997 through March 1998, plaintiff's working circumstances clearly changed after her transfer to a new team with a new direct supervisor at the ICO in March 1998.

For the same reasons, we reject plaintiff's suggestion that the mere fact that she was supervised by Inspector Kelly when she re-joined the FWC team under the Inspection Service CFA program after January 2000 revives the hostile work environment plaintiff alleges he created more than two years earlier. *See Compl.* at ¶ 161, 164. While it might be theoretically possible under Morgan for a single hostile work environment that commenced in 1997 to be ongoing after a more than 20 month hiatus, *see Morgan* at 2075, no reasonable jury could find it to be the case here because there is no evidence to indicate that plaintiff was mistreated by Inspector Kelly, who interviewed her and hired her for the Inspection Service CFA program with a substantial pay increase. *See Kelly Decl.* at ¶ 33.

In sum, because we find that many of plaintiff's pre-1999 allegations of discrimination concern discrete acts that are time-barred, that none of the alleged acts of discrimination post-May 9, 1999 are reasonably part of a hostile work environment, and that none of the post-May 9, 1999 allegations are otherwise

Not Reported in F.Supp.2d                                                                                      Page 12

Not Reported in F.Supp.2d, 2003 WL 1701998 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

actionable as gender-based discrimination, defendants' motion for summary judgment on plaintiff's Title VII claim is granted.FN13

> FN13. For the same reasons, to the extent the Second Circuit's continuing violation doctrine remains valid post-*Morgan,* we find that plaintiff's allegations fall far short of the " discriminatory policy or mechanism" that she would have to show to avail herself of the doctrine. *See Martin v. Reno,* 96 Civ. 7646, 1999 WL 527932, *9 (S.D.N.Y. July 22, 1999)* (" The continuing violation exception ... only applies to cases involving specific discriminatory policies or mechanisms." ).

### F. Equal Pay Act

**\*12** [4] With respect to plaintiff's Equal Pay Act claim, for the reasons stated above concerning the undisputed differences in qualifications between plaintiff and the two male CFAs allegedly receiving greater pay, the defendants' motion for summary judgment on this claim is granted. *See Shieldkret v. Park Place Entertainment Corp.,* 01 Civ. 0547, 2002 WL 91621, at *3 (S.D.N.Y. Jan.23, 2002) (holding that the Equal Pay Act is not violated when a higher salary is based on an employee's prior work experience); *Milligan v. Citibank, N.A .,* 00 Civ. 2793, 2001 WL 1135943, at *9 (S.D.N.Y. Sept.26, 2001) (dismissing Equal Pay Act claim under the statutory defense of " a differential based on any other factor other than sex" ).

### G. Fair Labor Standards Act

Plaintiff does not contest defendants' argument that her Fair Labor Standards Act claim for overtime pay she is allegedly owed from 1997 is time-barred. Accordingly, defendants' motion for summary judgment on this claim is also granted.

### CONCLUSION

For the reasons set forth above, plaintiff's complaint is hereby dismissed in its entirety.

IT IS SO ORDERED.

S.D.N.Y.,2003.
Costanzo v. U.S. Postal Service
Not Reported in F.Supp.2d, 2003 WL 1701998

(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

H

DeJesus v. Starr Technical Risks Agency, Inc.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Jose **DEJESUS**, Plaintiff,
v.
**STARR** TECHNICAL RISKS AGENCY, INC.,
Defendant.
**No. 03 Civ.1298 RJH.**

Sept. 27, 2004.

*MEMORANDUM OPINION AND ORDER*
HOLWELL, J.
**\*1** Defendant Starr Technical Risks Agency, Inc. (" Starr Tech" ) seeks summary judgment dismissing plaintiff Jose DeJesus' (" DeJesus" ) claims of racial discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended (" Title VII" ), 42 U.S.C. § 2000(e), *et seq.* For the reasons stated herein, defendant's motion is granted.

FACTS

The following facts, unless otherwise noted, are either undisputed or interpreted most favorably to plaintiff. Starr Tech underwrites property insurance policies for the oil, gas, chemical and petrochemical industries. (*See* Def.'s Rule 56.1 Statement ¶ 1 (hereinafter " Def. St." ).)

DeJesus began his employment with Starr Tech in 1988 as an Underwriting Assistant, a support staff job. (Pl.'s Resp. to Def.'s St. ¶ 2 (hereinafter " Pl. St." ); DeJesus Dep. at 31-32, attached to Aff. of James. J. Oh.) DeJesus does not have an engineering degree and, prior to working for Starr Tech, he did not have any education or experience in the energy or engineering fields. (*See id.* ¶ 5.) In fact, DeJesus' only prior experience in the insurance industry was as a clerical employee. (*See id.* ¶ 6.) In 1994, DeJesus was promoted to the position of Underwriter, with a concomitant increase in pay. (*See id.* at 8.) However, there was (and continues to be) a disparity in pay between DeJesus and all other underwriters employed by Starr Tech. (*See id.* ¶ 46.)

At the time he was promoted to Underwriter, DeJesus

had " handled renewals of existing Starr Tech business with management guidance, and ha[d] become proficient in reviewing submissions, policy insurance, and to some degree financial and engineering reviews." (Salary Change Recommendation Form, July 18, 1994, attached as Ex. F to Aff. of James J. Oh.) However, DeJesus admits that, at that time, he still " needed to develop a basic understanding of the fundamentals of underwriting." (DeJesus Dep. at 86.) Thus, when DeJesus was promoted to Underwriter, Starr Tech approved tuition reimbursement for him so that he could immediately begin taking courses to complete an Associate Degree in Insurance. (*See* Pl. St. ¶ 12.) By contrast, all the other Underwriters in DeJesus' department each had an engineering degree and/or prior work experience in the energy and/or insurance industries prior to working for Starr Tech. [FN1] (*See id.* ¶ 16.)

> FN1. The specific Starr Tech employees identified by plaintiff are Garrison, Gosselin, Haller, Piero, Kelley and Shaak, some of whom were hired not as Underwriters but as Senior Underwriters or Engineering Consultants. (*See* Pl. St. ¶ 21 & Def. St. ¶ 21.)

Following his promotion to Underwriter, DeJesus performed a dual role, working as an underwriter on smaller accounts, but continuing to provide support to more senior underwriters on more complex accounts. [FN2] (*See* Def. St. ¶ 10.) DeJesus was the only underwriter employed by Starr Tech who was required to perform the support functions of an Underwriter Assistant while working as an Underwriter. (*See* Pl. St. ¶ 51.) DeJesus also was and continues to be the only Hispanic underwriter at Starr Tech. (*See id.* ¶¶ 53-54.)

> FN2. Defendant calls this " a ' hybrid' job" . (Def.St.¶ 10.) Plaintiff argues that " DeJesus was promoted without qualification that it would be a ' hybrid' position," but acknowledges that DeJesus performed a " dual role of underwriter and underwriter assistant." (Pl.St.¶¶ 10, 51.)

Each of DeJesus' performance reviews from 1994 through 1999 recommended that he take a course on

Not Reported in F.Supp.2d                                                                                                   Page 2

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

" Introduction to Reinsurance" and that he complete his Associate Degree in Insurance. (*See id.* ¶ 17.) However, DeJesus has done neither of those things. (*See id.* ¶¶ 18-19.) Although DeJesus took courses at the College of Insurance towards completing an Associate Degree, he asserts that " [t]hese token courses are no substitute for on the job training because of their generic nature." [FN3] (*Id.* ¶¶ 63, 65, 66.) DeJesus asserts that the reinsurance course, which is taught on Starr Tech's premises, is also a " token" course. (*See id.* ¶¶ 61-62.)

> FN3. DeJesus asserts that he is " only five credits away from an Associates degree," Pl. St. ¶ 63; however, he admits that he has been pursuing that degree for over ten years. (*See* DeJesus Dep. at 18-19, attached in Decl. of Edward H. Wolf.)

**\*2** From 1995 through December 2000, DeJesus never received an overall score higher than a " Meets Expectations" on his performance appraisals. (*See id.* ¶ 13.) Each performance review from 1995 through December 2000 itemized areas in which DeJesus needed to improve his underwriting skills, including, *inter alia,* increasing his knowledge of reinsurance, developing a better knowledge and understanding of policies and policy language, and improving his understanding of the technical risks to be assessed. (*See id.* ¶ 14.) Despite needing improvement, DeJesus continued to receive annual pay increases and tuition reimbursement for Associate Degree courses, has not been demoted, had his pay cut, or seen his job duties diminished since being promoted to Underwriter. (*See id.* ¶ 15.)

However, DeJesus asserts that he received less underwriting training by employees at Starr Tech than other non-Hispanics hired as underwriters after DeJesus was promoted to Underwriter. (*See id* . ¶¶ 50, 67.) DeJesus also asserts that, at the time when certain other underwriters were hired by Starr Tech, DeJesus had more underwriting experience than the new hires notwithstanding their other qualifications. (*See id.* ¶ 52.)

DeJesus points to Starr Tech employee Doug Davies as an example of a Caucasian who was given preferential treatment. (*See id.* ¶ 73.) Davies, an Underwriter Assistant, was paid a salary in the mid-forties (e.g., $45,000) after two years of employment and was permitted to go on site visits and to build contacts. (*See id.* ¶¶ 71-72.) DeJesus, after 16 years

with Starr Tech, had a salary in the low to mid-fifties (e.g., $55,000) and allegedly had been denied similar opportunities for site visits and networking. (*See id.*) DeJesus also states that he is the only underwriter at Starr Tech who has a cubicle, rather than an office. (*See id.* ¶ 55.) Other individuals hired as Underwriters after DeJesus was promoted to Underwriter were given offices. (*See id.* ¶¶ 57-58.)

In a July 23, 1998, memorandum that memorialized a verbal warning, DeJesus was advised that the number of his unapproved absences was unacceptable, that he needed to show more of a commitment to Starr Tech before it could increase his underwriting duties, and that a failure to improve could lead to further disciplinary action. (*See id.* ¶ 23.) DeJesus claims that he was given this warning after he complained to the Human Resources department about Starr Tech's failure to provide him the training being provided to other employees. (*See id.* ¶¶ 68-69.) DeJesus was verbally counseled again on May 15, 2000, about unapproved absences. (*See id.* ¶ 24.) On June 26, 2000, DeJesus was issued a written warning cautioning that continued unapproved absences could lead to his termination. (*See id.* ¶ 25.)

DeJesus believed as early as 1996 that he was being discriminated against because of his race, *see id.* ¶ 28, and he believed as early as 1997 that he was " grossly underpaid, even by company standards." (DeJesus Dep. at 217.) On September 10, 2001, DeJesus filed a complaint with the New York State Division of Human Rights, which in turn was filed with the U.S. Equal Opportunity Employment Commission (" EEOC complaint" ). (*See* Compl. ¶ 6.) The EEOC complaint alleged that DeJesus was " denied the same treatment given non-Hispanic underwriters" in that, unlike Caucasian underwriters, (a) DeJesus was not given an assistant; (b) he was denied support and training enabling him to succeed and to be further promoted; and (c) he was paid less.[FN4] (EEOC compl. ¶ 4, attached to Compl.)

> FN4. On November 28, 2002, DeJesus received a Dismissal and Notice of Rights decision from the EEOC. (*See* Compl. ¶ 7.)

**\*3** Shortly before DeJesus filed the EEOC complaint, Starr Tech's New York office (where DeJesus worked) implemented a " team system" whereby one Underwriter and one Senior Underwriter were teamed with an Underwriting Assistant.[FN5] (*See* Pl. St. ¶ 29.) The team system has been an improvement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

over the working condition about which DeJesus complained in his EEOC complaint. (*See id.* ¶ 31.) Under the team system, DeJesus no longer performs Underwriter Assistant work, but rather performs " full-fledged Underwriter" work full time. (*See id.* ¶ 30.)

> FN5. DeJesus alleges that the team approach " did not really trickle down to" him until around January 2002, several months after he filed the EEOC complaint, and even then he was never " settle[d] into the team concept." (*See* Decl. of Pl. ¶¶ 5-6.)

However, in December 2001, shortly after the team system was implemented, a regularly scheduled audit of DeJesus' department was conducted by James Regan, an employee from Starr Tech's Chicago office. (*See id.* ¶ 34.) At the time of the audit, Regan had no supervisory authority over DeJesus and was not aware that DeJesus had filed the EEOC complaint. (*See* Regan Decl. ¶ 3, attached to Aff. of James J. Oh.) After auditing one of DeJesus' files, Regan recommended that a complete audit of all of DeJesus' files be done. (*See* Pl. St. ¶ 36.) Thus, DeJesus' underwriting authority was temporarily suspended for two months while this recommended review of DeJesus' files was performed. (*See id.* ¶ 37.) During that two-month period, DeJesus had to get approval from his superior in order to bind insurance coverage. (*See* DeJesus Dep. at 355-58.) After the review of his files was completed, DeJesus' underwriting authority was fully restored and no further action was taken. (*See* Pl. St. ¶ 39.)

In 2002 and 2003, DeJesus' performance reviews identified areas of performance that needed improvement. (*See id.* ¶ 33.) However, DeJesus received both salary increases and approval for tuition reimbursement for that period as well. (*See id.* ¶ 32.)

On February 26, 2003, DeJesus filed a complaint in the United States District Court for the Southern District of New York. The complaint alleges that DeJesus was promoted to Underwriter " in ' name only' [and] was ordered to perform the duties of underwriter assistant" despite his promotion. (Compl.¶ 10.) As in the EEOC complaint, DeJesus further alleges that (a) he was not given an assistant and (b) he was denied support and training enabling him to succeed and to be further promoted while " promotional opportunities [were] given to less-

qualified, non-Hispanic employees." (Compl.¶¶ 11-14.) The complaint alleges two causes of action: race discrimination and retaliation.<sup>FN6</sup> (*See* Com pl. ¶¶ 15-20.)

> FN6. The Court interprets plaintiff's first cause of action to be employment discrimination based on race. (*See* Compl. ¶ 1 (" This action is brought for discrimination in employment pursuant to Title VII" ).) Plaintiff's second cause of action, retaliation, was withdrawn by counsel at oral argument and will not be addressed in this opinion.

DISCUSSION

I. The Summary Judgment Standard

Summary judgment is appropriate when " there is no genuine issue as to any material fact" and the undisputed facts entitle the moving party to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, in order to defeat a motion for summary judgment, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but rather must come forth with affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986); *Gross v. Nat'l Broad. Co.,* 232 F.Supp.2d 58, 67 (S.D.N.Y.2002). The evidence must be such that " a reasonable juror could return a verdict" in favor of the non-movant. *Anderson,* 477 U.S. at 256. Summary judgment is " mandated" when " the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986).

*4 Courts evaluating summary judgment as to employment discrimination claims, which necessarily implicate an employer's intent, motivation, or state of mind, must tread cautiously. *See Meckenberg v. New York City Off-Track Betting,* 42 F.Supp.2d 359, 370 (S.D.N.Y.1999). " Because writings directly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs ., Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994). However, a court should not hesitate to grant summary judgment where a plaintiff has offered little or no evidence of discrimination. *See Gross,* 232 F.Supp.2d at 67-68. The standard that " the plaintiff must offer concrete evidence from which a reasonable juror could return a verdict in his favor," *Meckenberg,* F.Supp.2d at 370 (quotations omitted), " applies no less in discrimination cases than to other areas of litigation." *Gross,* 232 F.Supp.2d at 67. " Indeed, it is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Id.* at 68.

### II. Discrimination and Disparate Pay

Defendant argues that plaintiff's discrimination and disparate pay claims are time-barred. (*See* Def.'s Mem. in Support of Summ. J. at 7-8 (hereinafter " Br." ); Def.'s Reply Mem. in Support of Summ. J. at 3-5 (hereinafter " Reply" ).) With respect to disparate pay, defendant also argues that summary judgment should be granted in its favor because plaintiff did not plead disparate pay in his complaint. (*See* Reply at 2.) Defendant further argues that there is no evidence of an adverse employment action, discrimination based on race, or pretext. (*See* Br. at 10-14; Reply at 5-7.)

Plaintiff argues that " the thrust of his discriminatory wage claim centers around the case of *Bazemore v. Friday,"* 478 U.S. 385 (1986), and is therefore timely.[FN7] (*See* Pl. Mem. in Opp'n to Summ. J. at 2 (hereinafter " Opp'n" ).) Plaintiff further argues that the following facts support his claim of discrimination: (a) " after the ' promotion' 90% of his time was spent doing the job [of an Underwriter Assistant]" and thus " he had no time to learn the skills of an Underwriter" ; [FN8] (b) " he is the only Underwriter at Starr Technical that does not have his own office" ; and (c) " his pay is approximately 1/2 of the pay given to the other Underwriters" . (*Id.* at 1, 13-14)

FN7. Plaintiff does not expressly argue that that the grievances other than disparate pay are timely; however, the Court assumes that

plaintiff's argument is meant to encompass the other grievances on the same basis (namely, the *Bazemore* decision) as the wage disparity.

FN8. Plaintiff characterizes this grievance as being " programmed to fail" . (Opp'n at 13.)

### A. The Timeliness of Plaintiff's Claims

Turning first to whether plaintiff's claims are time-barred, the Court notes that " in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... such charge shall be filed by or on behalf of the person aggrieved *within three hundred days after the alleged unlawful employment practice occurred"* . 42 U.S.C. § 2000e-5(e)(1) (emphasis added). This short time period indicates that " Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109 (2002).

**\*5** Reviewing the undisputed facts of this case, it is clear that plaintiff's grievances stem from his promotion to Underwriter in 1994, after which point plaintiff alleges that he (1) should not have been required to perform the dual role of Underwriter and Underwriter Assistant; (2) should have received his own office; and (3) should have received pay equivalent to other Underwriters. In substance, plaintiff claims that his " promotion was ' in name only' ." (Compl.¶ 10.) Given that these grievances first arose in 1994-considerably more than 300 days before DeJesus filed the EEOC complaint in September, 2001, the issue of timeliness turns on (a) when DeJesus had notice of the allegedly discriminatory actions, *see Van Zant v. KLM Dutch Royal Airlines,* 80 F.3d 708, 713 (2d Cir.1996) (" The timeliness of a discrimination claim is to be measured from the date the claimant had notice of the alleged discriminatory action" ), and (b) whether these grievances amount to a continuing violation, in which case timeliness would be measured from the latest day on which DeJesus suffered a discriminatory action that was part of the continuing violation, *see Elmenayer v. ABF Freight Sys., Inc.,* 318 F.3d 130, 134 (2d Cir.2003).

Even if DeJesus did not know on the day that he got promoted in 1994 that he would be doing both

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

Underwriter and Underwriter Assistant work, working in a cubicle, and getting paid less, he admits to knowing of these grievances more than 300 days before he filed the EEOC complaint. As DeJesus believed in 1996 and 1997-several years after his promotion and several years before his EEOC complaint-that he was being discriminated against because of his race (including being " grossly underpaid," DeJesus Dep. at 217), alleged lack of notice cannot make DeJesus' claim timely.

That conclusion brings the Court to the continuing violation doctrine articulated in *Bazemore.* In *Bazemore,* employees and service recipients of a North Carolina State University organization sued the University and various officials for racial discrimination in employment and in the provision of services. *See Bazemore,* 478 U.S. at 388-91. Specifically, plaintiffs there alleged, *inter alia,* that the organization " had failed to recruit, hire, and assign blacks on an equal basis with whites; had denied blacks the same compensation, terms, conditions, and privileges as were provided to whites; [and] had segregated blacks in work assignments" . *Id.* at 392 n. 3. The allegations arose out of the organization's failure to correct disparities existing after a merger of two of its branches (one white, one black) that were separate prior to 1965. *See id.* at 394. The Supreme Court, reversing a contrary appellate court ruling, held " that the [organization] discriminated with respect to salaries *prior* to the time it was covered by Title VII does not excuse perpetuating that discrimination *after* the [organization] become covered by Title VII." *Id.* at 395 (emphasis in original). The Supreme Court reasoned:
*6 A pattern or practice that would have constituted a violation of Title VII but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent that an employer continued to engage in that act or practice, it is liable under that statute. While recovery may not be permitted for the pre-1972 [effective date] acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed. Each week's paycheck that delivers less to a black than a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII. *Id.* at 395-96.

Thus, under the continuing violation doctrine, " a plaintiff who files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997).

The continuing violations doctrine is a " narrow exception to the limitations period," *Blake v. Bronx Leb. Hosp. Ctr.,* No. 02 Civ. 3827(CBM), 2003 WL 21910867, at *5 (S.D.N.Y. Aug. 11, 2003), and courts of this Circuit have generally been loath to apply it without a showing of compelling circumstances. *See Little v. Nat'l Broad. Co.,* 210 F.Supp.2d 330, 366 (S.D.N.Y.2002). The doctrine has essentially been limited to situations where a specific discriminatory policy or mechanism has been alleged. *See Blake,* 2003 WL 21910867, at *5. Completed acts or discrete incidents such as termination or resignation, job transfer, discontinuance of a job assignment, denial of a promotion or increased pay grade, or failure to compensate adequately are not acts of a continuing nature and, thus, cannot be the premise of a continuing violation claim. *See id.* at *5, 7; *Little,* 210 F.Supp.2d at 366; *Gross,* F.Supp.2d at 68. " Nor can a continuing violation be established merely because the claimant continues to feel the effects of a time-barred discriminatory act or merely because the claimant continues his or her employment." *Little,* 210 F.Supp.2d at 366 (quotations omitted); *accord Lightfoot,* 110 F.3d at 907. Rather, the claimant must allege both the existence of an ongoing policy of discrimination and some act taken in furtherance of that policy within the limitations period. *See Little,* 210 F.Supp.2d at 366.

When determining whether specific and related discriminatory acts constitute a discriminatory practice, courts in this district have examined (a) whether the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation; (b) whether the alleged acts are recurring or more in the nature of an isolated work assignment or employment decision; and (c) whether the alleged acts have a " degree of permanence" . *See id.* at 366-67. " The continuing violation doctrine is less likely to apply when the time-barred acts have the degree of permanence which should trigger an employees awareness and duty to assert his or her rights." *Id.* at 367 (quotations omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 6

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

*7 DeJesus' situation is similar to that of someone denied a promotion, pay increase, or a transfer in that, although the effects of the discriminatory actions may be felt by defendant " for as long as he remains employed," the alleged discriminatory actions-denial of an office, denial of an opportunity to do exclusively underwriting work, and denial of a pay raise-are discrete acts. _Elmenayer,_ 318 F.3d at 135. _See, e.g., Lightfoot,_ 110 F.3d at 907 (" If Lightfoot was entitled to a pay raise because of the added responsibilities of his new position, the entitlement arose at the time of his promotion." ); _Gross,_ 232 F.Supp.2d at 69 (dismissing as time-barred all claims arising over 300 days before plaintiff filed EEOC complaint, including claims relating to initial compensation, assignment to particular department, and denial of personal services contract); _Hudson v. Delphi Energy & Engine Mgmt. Sys., Inc.,_ 10 F.Supp.2d 256, 259 (W.D.N.Y.1998) (" [P]laintiff alleges specific discriminatory acts beginning at her promotion in 1983" ). The allegedly discriminatory acts had a permanent effect and should have triggered DeJesus to file a claim soon after he was promoted in 1994. Indeed, discounting the implementation of the team system, DeJesus' situation allegedly had not changed since his promotion until the time he filed the EEOC complaint in September 2001. The Court also finds that the grievances are not a continuing violation because plaintiff offers no evidence that defendant engaged in a pattern or policy of discrimination. _See, e.g., Gross,_ 232 F.Supp.2d at 69 (" [Plaintiff] offers no evidence that [defendant] maintained and/or applied any type of discriminatory policy or practice." ). Thus, the Court concludes that DeJesus' Title VII claim is barred in so far as he alleges that his promotion was in name only, that he had to perform the dual role of Underwriter and Underwriter Assistant, that he was not given time to learn the skills of an Underwriter, and that he did not receive his own office upon becoming an Underwriter.

However, with respect to his equal pay claim, the Court agrees with plaintiff's argument that " each paycheck reflecting the disparity is a separate act of discrimination." (_See_ Opp'n at 8 .) " [A] claim of discriminatory pay is fundamentally unlike other claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action." _Pollis v. New Sch. for Soc. Research,_ 132 F.3d 115, 119 (2d Cir.1997). _See also Quarless v. Bronx-Leb. Hosp. Ctr.,_ 228 F.Supp.2d 377, 382

(S.D.N .Y.2002) (" each paycheck that Plaintiff received was an (alleged) immediate and individual wrong which gave rise to a separate disparate pay claim" ). Therefore, assuming his claim is not faulty for other reasons, DeJesus may proceed with a claim for disparate pay for paychecks he received within and after the 300-day period before filing the EEOC complaint.FN9 _See, e.g., Meckenberg,_ 42 F.Supp.2d at 376 n. 7 (holding plaintiff " is barred from recovery based on paychecks received before [300 days prior to filing EEOC complaint], but not those received after that date, assuming she proves intentional discrimination" ); _Hudson,_ 10 F.Supp.2d at 259-61 (barring as untimely claims related to transfer and denial of pay raise but allowing claim as to disparate pay).

> FN9. DeJesus cannot, however, convert his claim into one for a continuing violation based on the timeliness of his disparate pay claim. _See Blake,_ 2003 WL 21910867, at *7 (" Plaintiff cannot avail himself of the continuing violation doctrine in order to render timely any disparate pay allegations which occurred outside the ... statute of limitations" ); _Quarless,_ 228 F.Supp.2d at 382 (" Plaintiff cannot use the continuing violation doctrine to render timely any disparate pay violations which occurred outside the 300 day statute of limitations" ).

### _B. Pleading a Claim for Disparate Pay_

*8 Having determined that plaintiff's disparate pay claim is not time-barred, the Court considers whether DeJesus asserted this claim in his complaint and, if not, whether he may assert it now. Defendant argues that both of these questions should be answered in the negative. (_See_ Reply at 2.)

There is no disparate pay claim alleged in plaintiff's barebones complaint. (_See_ Compl. ¶¶ 1-20.) The only mention of any sort of pay in DeJesus' pleadings is found in the EEOC complaint, which is attached to the Complaint. The EEOC complaint alleges that, " [a]s a result of complainant's being compelled to perform the job of [Underwriter Assistant] in addition to his underwriter position, his compensation has suffered." (EEOC compl. ¶ 4(d).) Though a " short and plain statement" is sufficient to set forth a claim for relief, Fed.R.Civ.P. 8(a), the Court finds that the language in the EEOC complaint simply does not assert, even vaguely, a claim for disparate pay.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Innumerable acts of discrimination negatively impact a plaintiff's compensation but do not necessarily give rise to a disparate pay claim. Indeed, plaintiff's EEOC complaint alleges his compensation suffered because he was being required to perform a *different* job than other underwriters (namely, the dual role of underwriter and underwriter assistant), as opposed to performing the *same* job but being paid less, which of course is the essence of a disparate pay claim. *See Conigliaro v. Horace Mann Sch.,* No. 95 Civ. 3555(CSH), 2000 WL 45439, at *8 (S.D.N.Y Jan. 19, 2000) (" [T]he performance of some common tasks does not make jobs substantially equal when material differences also exist." ).

However, finding that a claim is not alleged in a complaint does not lead inevitably to the conclusion that DeJesus cannot assert a disparate pay claim now. Although generally " it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment," *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 170 F.R.D. 111, 119 (S.D.N.Y.1997), a court may allow a claim that, while inartfully stated, is alleged in substance in the complaint such that a defendant would not be prejudiced by its late assertion. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 568-70 (2d Cir.2000).

Reviewing the record before it, the Court finds that defendant would in fact be prejudiced by the late assertion of a disparate pay claim. As discussed more fully in the next section, the record presented to the Court is missing evidence that is obviously relevant to a disparate pay claim. This omission suggests that the parties did not conduct discovery into a disparate pay claim. Given the apparent lack of discovery, the Court finds that Starr Tech would be unduly prejudiced in defending against a disparate pay claim and, thus, concludes that plaintiff should not be allowed to assert it at this stage of the litigation, in opposition to summary judgment and after the close of discovery. *See, e.g., Kahn v. Abercrombie & Fitch, Inc.,* No. 01 Civ. 6163(WHP), 2003 WL 22149527, at *10 (S.D.N.Y. Sept. 17, 2003).

### C. The Merits of Plaintiff's Disparate Pay Claim

**\*9** Even if the Court were to allow DeJesus to assert a claim for disparate pay at this late stage, the claim would fail on the merits. Courts analyzing discrimination claims under Title VII apply a three step burden-shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792

(1973). Under this framework, a plaintiff must first establish a prima facie case for disparate pay by showing: (1) that he was a member of a protected class; (2) that he was paid less than similarly situated nonmembers of his protected class; and (3) evidence of discriminatory animus. *See Quarless,* 228 F.Supp.2d at 383. Upon establishing a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action or conduct. *See Medina v. New York City Dep't of Parks,* No. 01 Civ. 7847(DKC), 2002 WL 31812681, at *5 (S.D.N.Y. Dec. 12, 2002). If the employer can articulate a legitimate reason, the burden shifts back to plaintiff to show that defendant intentionally discriminated against the plaintiff. *See id.* " An employer that has put forth nondiscriminatory reasons for its employment action is entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.* (quotations omitted).

Defendant challenges DeJesus' prima facie allegations regarding similarly situated persons and DeJesus' allegations regarding his final burden of showing intentional discrimination. (*See* Reply at 5-7.) The Court is persuaded by both of defendant's arguments.

#### 1. Similarly Situated Employees

To be " similarly situated," the individuals with whom DeJesus attempts to compare himself must be similarly situated in all material respects. *See Medina,* 2002 WL 31812681, at *4. Their circumstances need not be identical, *see id.,* but they must share a sufficient amount of significant employment characteristics to be considered similarly situated. *See Quarless,* 228 F.Supp.2d at 383. These characteristics include similarities in education, seniority, performance, and specific work duties. *See, e.g., Quarless,* 228 F.Supp.2d at 384 (noting plaintiff does not account " for differences in education, seniority, performance, or specific work duties" ). With respect to work duties, " the performance of some common tasks does not make jobs substantially equal when material differences also exist." *Conigliaro,* 2000 WL 45439, at *8.

DeJesus is dissimilar from other Underwriter employees at Starr Tech in three material respects. First, it is undisputed that, unlike DeJesus, the other employees with whom DeJesus compares himself

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

have either an engineering degree, prior experience in the energy industry, prior experience in the insurance industry, or a combination of those qualifications. Thus, DeJesus has a different background, namely less experience and less education, than the other employees. Second, the other employees appear to have performed better than DeJesus. It is undisputed that, from 1995 through December 2000, DeJesus never received an overall score higher than a " Meets Expectations" on his performance appraisals. In contrast, the other individuals " all have very high performance appraisals." (Shaak Dep. at 94, attached to Aff. of James H. Oh; *see also id.* at 101 (" I don't know the exact score, but it would probably be in the exceeds expectation range." ).) Third, DeJesus was not performing the same job as the other employees. It is undisputed that DeJesus performed a " dual" or " hybrid" job, unlike the other employees.[FN10] (*See* Pl. St. ¶ 51; Def. St. ¶ 10.) In fact, some of the employees with whom DeJesus compares himself were hired not even as Underwriters, the position to which DeJesus was promoted, but as Senior Underwriters or Engineering Consultants.[FN11] For these reasons, the Court finds that the other employees are not similarly situated to DeJesus, and DeJesus has thus not established a prima facie case.[FN12] *See, e.g., Staff v. Pall Corp.,* 233 F.Supp.2d 516, 536 (S.D.N.Y.2002) (noting plaintiff " simply dismisses any difference between his performance evaluations and those of" other employees); *Quarless,* 228 F.Supp.2d at 384 (noting plaintiff does not account " for differences in education, seniority, performance, or specific work duties" ); *Meckenberg,* 42 F.Supp.2d at 377 & n. 9 (noting plaintiff did not have similar job responsibilities and experience as other employees).

> FN10. While this point might have supported a claim for disparate treatment had that claim been asserted in 1994, it weighs against DeJesus in a disparate pay context because the point highlights dissimilarity.

> FN11. DeJesus' allegation that Starr Tech employee Doug Davies received better treatment as an Underwriter Assistant than DeJesus received in that post does not bear upon DeJesus' treatment as an Underwriter, and any claim relating to DeJesus' time as an Underwriter Assistant is time-barred.

> FN12. This finding is also supported by

plaintiff's failure to provide evidence on which the Court could base a contrary conclusion. For example, plaintiff has not provided the Court with the performance appraisals of the alleged similarly situated employees. Nor has plaintiff provided evidence of the exact compensation of the other employees and when they received such compensation. Nor has plaintiff provided evidence of the specific duties and tasks of the other employees. " Although the plaintiff's burden in making out a prima facie case is minimal," it nevertheless is a burden that must be met in order to proceed with a claim. *Medina,* 2002 WL 31812681, at *4. DeJesus has not met this burden.

### 2. Intentional Discrimination

**\*10** Assuming *arguendo* that DeJesus had established a prima facie case, his claim would still fail at the final burden shifting stage because there is no evidence from which a reasonable juror could conclude that Starr Tech intentionally discriminated against DeJesus based on race.

If an employer puts forth nondiscriminatory reasons for its employment decision, plaintiff must point to admissible evidence from which a trier of fact could infer that the employer's asserted justification is false and that prohibited discrimination was the real reason. *See Medina,* 2002 WL 31812681, at *5; *accord Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996). A plaintiff's own conclusory statements and subjective feelings will not suffice to meet this burden. *See, e.g., Gross,* 232 F.Supp.2d at 72.

Here, Starr Tech has pointed to three reasons why DeJesus was paid less than other underwriters: (1) he had less experience; (2) his performance was worse; and (3) he was performing a different job. Plaintiff argues that " [t]he fact that DeJesus met expectations indicates that his employers were not displeased with his performance" and that whether he performed as well as other employees is a question of fact for the jury. (Opp'n at 12.)

This argument does not satisfy plaintiff's burden. The only " evidence" plaintiff has submitted are his own conclusory statements and beliefs, which, even if credited, do not raise an inference of racial animus. Even assuming Starr Tech " was not displeased"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

with DeJesus' performance, Starr Tech appears to have been more pleased with the performance of other employees. DeJesus has not put forth evidence, such as the performance appraisals of other employees, rebutting that apparent fact. Similarly, he has not put forth evidence showing that non-Hispanic employees with qualifications similar to his were paid more. DeJesus' personal belief that he is as qualified as the other employees who were paid more is not enough to create an issue of fact when the other employees admittedly have more relevant work or educational experience that plaintiff lacked. *See Holt,* 95 F.3d at 130 (noting personal belief that plaintiff was most qualified is belied by fact that others had more experience); *Staff,* 233 F.Supp.2d at 538 (" Plaintiff's personal view of his ... performance is irrelevant." ). Furthermore, there is no evidence that the disparate pay was the result of any *racial* animus. Title VII prohibits certain discrimination; it does not protect an employee from general unfairness, *see Delgado v. P.R. Family Inst., Inc.,* No. 97 Civ. 7122(DAB), 2001 WL 964000, at *6 (S.D.N.Y. Aug. 23, 2001), and " [i]t is not the function of this Court to second-guess an employer's business decisions." *Meng,* 73 F.Supp.2d at 399. There is simply no evidence that DeJesus' race motivated any of Starr Tech's decisions or actions. *See, e.g., Medina,* 2002 WL 31812681, at *5 (" no direct evidence of racial animus" ); *Gross,* 232 F.Supp.2d at 72. Since none of the evidence suggests that a genuine issue of any material fact remains concerning defendant's articulated reasons for DeJesus' lower pay, even if plaintiff were allowed to assert a disparate pay claim and even if a prima facie case had been made, Starr Tech would still be entitled to summary judgment.

### III. Hostile Work Environment

***11** DeJesus, in his opposition to summary judgment, seeks to include a hostile work environment claim. (*See* Opp'n at 10.) Defendant argues that this claim is not raised in the complaint and plaintiff cannot raise it now for the first time in opposition to summary judgment. (*See* Reply at 7.) Defendant further argues that a hostile work environment claim is beyond the scope of DeJesus' EEOC complaint and, therefore, is now barred. (*See* Reply at 7-8.) Finally, defendant argues that (a) the allegations are insufficient, as a matter of law, to be considered hostile; (b) there is no evidence that defendant's conduct was related to plaintiff's race; and (c) DeJesus did not suffer an injury during the time of the alleged hostile environment. (*See* Reply at 8-10.)

#### A. Pleading a Claim for Hostile Work Environment

Turning first to whether plaintiff may include a claim for hostile work environment, the Court again notes that, as a general matter, " it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Bonnie & Co.,* 170 F.R.D. at 119. However, this rule is not an absolute bar. As discussed above, a court may consider a claim that, while not expressly stated in an inartfully drafted complaint, is alleged in substance, such that a defendant would not prejudiced by its late inclusion. *See Cruz,* 202 F.3d at 568-70.

In the present action, the Court finds that the complaint does not allege explicitly or implicitly a claim for hostile work environment. (*See* Compl. ¶ ¶ 1-20.) In addition, reviewing the declarations and deposition transcripts submitted with the briefs on this motion, it does not appear that discovery was conducted into this claim. Thus, the Court concludes that defendant would be prejudiced if plaintiff were allowed to proceed with a claim for hostile work environment. *See, e.g., Kahn,* 2003 WL 22149527, at *10. For these reasons, the Court declines to allow DeJesus to proceed with a hostile environment claim.

#### B. The Merits of Plaintiff's Hostile Work Environment Claim

Furthermore, the Court finds that plaintiff's hostile environment claim would be deficient on the merits if it were allowed to proceed. In order to establish a claim for hostile work environment, plaintiff must demonstrate a workplace " permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Staff,* 233 F.Supp.2d at 543 (quotations omitted). The environment must be subjectively and objectively offensive, such that, not only the victim, but also a reasonable person would find it hostile and abusive. *See id.* at 543-44. In determining whether plaintiff has sufficiently alleged a claim for hostile work environment, a court considers the totality of the circumstances, " including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 544 (quotations omitted). As a general rule, incidents

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

must be more than episodic or occasional; they must be sufficiently continuous, concerted, and regular to be considered pervasive. *See id.; accord Meckenberg,* 42 F.Supp.2d at 374. In addition to pervasiveness, in order to establish a race-based hostile work environment claim, " a plaintiff must demonstrate that the conduct occurred because of his race." *Staff,* 233 F.Supp.2d at 544.

*12 Plaintiff has put forth neither evidence that the environment was pervasive nor evidence that defendant's conduct was motivated by race. Even assuming all of plaintiff's grievances are true-that he was paid less than other employees, that he was wrongfully denied an office, and that he was wrongfully denied an assistant thereby preventing him from devoting his time to underwriting work-the grievances " simply fail to rise to the level of severity or pervasiveness necessary for a successful hostile environment claim." *Meckenberg,* 42 F.Supp.2d at 374; *see, e.g., Staff,* 233 F.Supp.2d at 544 (granting summary judgment on hostile environment claim where plaintiff was denied " the benefits of employment to which he was entitled, such as personnel to work on his projects (like every other Project Manager had) and an office" ). " Meritorious hostile environment claims have depended upon the existence of a ' poisoned' atmosphere, where the individual is required to run ' a gauntlet of discriminatory abuse' in return for the privilege of being allowed to work." *Meckenberg,* 42 F.Supp.2d at 374 (citations omitted). That is not the case here. DeJesus does not allege a continuous stream of derogatory comments, insults, intimidation tactics or ridicule. He does not allege an atmosphere so poisoned that he was mentally or physically unable to work. DeJesus' claim that he was humiliated by having to work in a cubicle when others had offices is not enough to satisfy the " objectively offensive" standard. *Cf. Staff,* 233 F.Supp.2d at 531-32 (noting that failure to provide office does " not rise to the level of being actionable adverse employment action[ ]" ).

Furthermore, as with his discrimination claims, there is no evidence that DeJesus' situation had any relation to his race. " A plaintiff must also demonstrate that she was subjected to the hostility *because of* her membership in a protected class." *Brennan v. Metro. Opera Ass'n Inc.,* 192 F.3d 310, 318 (2d Cir.1999) (emphasis added). The totality of DeJesus' evidence on this point is made up of his own conclusory statements and personal beliefs that he was as

qualified as other non-Hispanic underwriters who received better treatment. However, as discussed earlier, defendant has submitted unrebutted evidence of nondiscriminatory reasons to explain why other non-Hispanic underwriters were paid more. Plaintiff has failed to submit evidence from which a reasonable juror could find that DeJesus' alleged mistreatment was racially motivated. Therefore, the Court finds that DeJesus' hostile environment claim would fail under summary judgment scrutiny if it were allowed to be asserted.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [23-1] is GRANTED. The Clerk shall close this case.

SO ORDERED.

S.D.N.Y.,2004.
DeJesus v. Starr Technical Risks Agency, Inc.
Not Reported in F.Supp.2d, 2004 WL 2181403 (S.D.N.Y.)

END OF DOCUMENT