Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 831665 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

H
Hnot v. Willis Group Holdings Ltd.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Shelley HNOT, et al., Plaintiffs,
v.
WILLIS GROUP HOLDINGS LTD., Willis North America Inc., et al. Defendants.
No. 01 Civ. 6558(GEL).

April 8, 2005.

Linda P. Nussbaum, Joseph M. Sellers, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, New York, Martin R. Lee, Lawrence J. Profeta, Warshaw Burstein Cohen Schlesinger & Kuh, LLP, New York, New York, for plaintiffs.
Bettina B. Plevan, Myron D. Rumeld, Proskauer Rose, LLP, New York, New York, for defendants.

OPINION AND ORDER

LYNCH, J.

*1 Plaintiff Shelley Hnot brings this employment discrimination action against her former employer, Willis Group Holdings, and affiliated entities (collectively, " Willis" ). Plaintiff alleges that she was underpaid, denied promotions, and demoted due to her gender, in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C.2000e-2 et seq. (" Title VII" ). She also claims that she was terminated in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission (" EEOC" ), a protected activity under Title VII. 42 U.S.C. § 2000e-3. In an Opinion and Order dated March 18, 2005, this Court granted a motion by plaintiffs Hnot and Heidi Scheller for class certification. Hnot v. Willis Group Holdings Ltd., 01 Civ. 6558(GEL), 2005 WL 659475 (S.D.N.Y. March 21, 2005). Defendants now move for summary judgment on Hnot's individual claims on the grounds that they are time-barred, and that plaintiff can not establish a prima facie case, or demonstrate that defendants' alleged non-discriminatory reasons for their actions were pretextual.[FN1] For the reasons below, defendants' motion will be denied in part and granted in part.

FN1. A similar motion regarding Heidi Scheller's claims is discussed in a companion opinion.

BACKGROUND

Hnot was employed for 24 years at Willis, an insurance brokerage company. Willis has regional offices across the country, each led by a Regional Executive Officer (" REO" ). (Kelly Dep. 26-27.) Each region, in turn, had local offices, headed by a Chief Executive Officer (" CEO" ) and Chief Operating Officer (" COO" ). (Murphy Decl. ¶ 6.) Further details about Willis's organizational structure and its various job titles are set forth in the Court's class certification opinion. See Hnot, 2005 WL 659475, at *2-5. Hnot was employed in the New Jersey office, which was part of Willis's Northeast Region.

In 1995, Hnot became a Team Leader, the only woman in the New York/New Jersey offices to hold such a position. (Hnot Dep. 113.) As a Team Leader, Hnot was responsible for managing her team, soliciting new business, and servicing the accounts held by the team. (Hnot Dep. 153-54, Murphy Dep. 95.) Hnot was also awarded an officer title of Senior Vice President, which did not increase her base salary or her eligibility for bonuses. (Murphy Decl. ¶¶ 13, 16-17.) Hnot reported to the New York COO, first Joe McSweeney and later James Murphy. (Hnot Dep. 128.)

According to plaintiff, Willis management eventually began to systematically undermine her efforts to retain her accounts, and to obtain new business for her team. (Hnot Decl. ¶ 28, 57, 59-73.) For example, when Hnot sought the assistance of a " producer," that is, a Willis employee whose primary role was to produce business, her requests were repeatedly denied, and her own efforts to solicit new business were blocked. (Hnot Dep. 75-76, 168-70.) Hnot avers that such treatment contrasted with that accorded other, male-led, teams who had in-team producers, and assistance from non-designated producers. (Hnot Decl. ¶¶ 23, 25.) Hnot also contends that Willis management set production goals that were unreasonably high for the size of her team. (Hnot Decl. ¶ 44.)

*2 During Hnot's tenure as Team Leader, she was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

paid less than all but one of the male Team Leaders. *See* Murphy Decl. ¶¶ 61-65, 71-76 (showing that Hnot was paid $146,000 in 1998, the second lowest salary among eight Team Leaders). She received no raise in 1998, and was informed that this was because she had the highest ratio of salary to book of business in the New York and New Jersey offices. (Murphy Decl. ¶ 56.) Hnot also received no raise in 1999. (*Id.* at ¶ 67.) Hnot was similarly denied bonuses in both 1998 and 1999, purportedly because her team fell short of reaching certain financial goals. (Murphy Decl. ¶ 80.)

After Hnot was promoted to Team Leader, she failed to be promoted to any higher position, even though the New York COO position became available in 1997 (Hnot Dep. 84), and was not filled until February 1998. (Murphy Dep. 75.) The New York CEO position was not filled until 1999, and New Jersey CEO position was filled in 2000. (Murphy Dep. 71, 75.) All these positions were filled by men. (Hnot Dep. 15, 20, 86; Hnot Dep. II 413.)

In 1997, Willis North America began a review process called Business Process Reengineering (" BPR" ). As part of the BPR process, employees were assessed based on various " skill/will" criteria. (Sicard Dep. 231-232.) Hnot's skill/will assessment was conducted by Murphy. (Mathieson Dep. 41.) Later in 1998, shortly after Murphy became the New York COO, he began to reorganize Willis's New Jersey office. (Murphy Decl. ¶ 20, Ex. A.) Subsequently, Hnot was removed from her Team Leader position, and transferred to another team. (Murphy Decl. ¶ 28, Ex. G; Murphy Dep. 48.) On August 26, 1999, Hnot filed a charge of discrimination with the EEOC. (Am.Compl.¶ 51.) One month later, on September 25, 1999, Murphy was informed of the charge, and on December 17, 1999, he recommended Hnot's termination. (Murphy Dep. 55-56; Murphy Dep. II 52-53.) On March 22, 2000, Hnot's employment was terminated. Hnot, along with other female Willis employees, filed a class action complaint against Willis on July 19, 2001.

### DISCUSSION

#### I. *Summary Judgment Standard*

Summary judgment shall be granted " if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A " genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). In deciding a summary judgment motion, the court must " resolve all ambiguities and draw all reasonable references in the light most favorable to the party opposing the motion." *Cifarelli v. Vill. Of Babylon,* 93 F.3d 47, 51 (2d Cir.1996). In addition, the court is not to make any credibility assessments or weigh the evidence at this stage. *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996).

*3 The nonmoving party, however, may not rely on " conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The non-moving party " must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and must make a " showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).[FN2]

> FN2. Plaintiffs argue that evidence of a pattern or practice of discrimination alters the summary judgment standard, by creating a presumption of discrimination for each individual plaintiff. In *Robinson v. Metro-North Commuter R.R. Co.,* 267 F.2d 147, 159 (2d Cir.2001), the Second Circuit explained that a *finding* of a pattern or practice of discrimination at the liability phase of a disparate treatment case creates a presumption of discrimination for class members at the subsequent remedial phase. However, there is little, if any, case law on the effect of a pattern or practice claim at the summary judgment stage for an individual plaintiff. Plaintiffs cite a Tenth Circuit case, *Thiessen v. Gen. Electric Capital Corp.,* 267 F.3d 1095 (2001), which reasoned in a pattern or practice case, that " until the first [liability] stage is resolved, we question whether it is proper for a court to consider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 3
Not Reported in F.Supp.2d, 2005 WL 831665 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

summary judgment motions regarding second stage issues (i.e., whether individual plaintiffs are entitled to relief)." *Id.* at 1109. The court concluded that "[e]ven assuming ... such motions [for summary judgment on pattern or practice claims] can properly be considered prior to resolution of the first stage, it is clear they would not be analyzed under the typical McDonnell-Douglas framework." *Id.* at 1109. While this argument holds some resonance here in a class action case, plaintiff's own response focuses on her individual claims, which would be analyzed under the *McDonnell* framework rather than on any pattern or practice disparate treatment claim. Moreover, because plaintiff meets her burden under the *McDonnell* standard, without the aid of a presumption of discrimination, it is unnecessary to determine whether plaintiff's proposed altered standard would apply here.

### II. *Statute of Limitations*

Title VII claims must be filed with the EEOC within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e)(1). Under Title VII, each discrete act of discrimination "constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002). A plaintiff can "only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.* Recovery is precluded for acts outside the time period, even if related acts occurred within it. *Patterson v. County of Oneida,* 375 F.3d 206, 220 (2d Cir.2004). Hnot filed her charge with the EEOC on August 26, 1999 (2d Am.Compl.¶ 51), and filed her complaint on July 19, 2001. Therefore, Hnot's discrimination or retaliation claims based on any discrete acts that occurred before October 30, 1998 are barred under federal law.[FN3]

> FN3. Similar statute of limitations apply under the applicable state law. The New Jersey Law Against Discrimination has a two-year statute of limitations. N.J. Stat. §§ 10:5-1; *Shepard v. Hunterdon Dev. Ctr.,* 803 A.2d 611, 621-23 (N.J.2002). The New York Human Rights Law has a three-year statute of limitations. N.Y. C.P.L.R. § 214; *Patrowich v. Chemical Bank,* 98 A.D.2d 318, 324 (N.Y.Sup.Ct.1984). It is unclear whether New Jersey or New York law applies, and as neither party has addressed this issue, the Court defers consideration of this issue to a later date.

Calculation of the limitations period is sometimes complicated by the "continuing violation" doctrine. "[I]f a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act." *Washington v. County of Rockland,* 373 F.3d 310, 317-18 (2d Cir.2004), quoting *Fitzgerald v. Henderson,* 251 F.3d 345, 349 (2d Cir.2001). A continuing violation is conduct that is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan,* 536 U.S. at 111. Under *Morgan,* however, Hnot's claims of discriminatory failure to promote and retaliatory termination are considered discrete, separately-actionable practices that occur on specific ascertainable dates, and are not continuous violations. *See id.* at 114 (explaining that discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire"). Thus, any such claim based on events occurring before the cut-off dates set forth above are time-barred.

This conclusion, however, does not defeat Hnot's claims. Her claim of retaliatory termination is clearly timely under state and federal law, and so are at least some of her failure to promote claims. For example, the New Jersey CEO position was filled in 2000 and the New York CEO position was filled in 1999, while Hnot was still employed at Willis and well within the applicable limitations period. At any rate, even evidence of allegedly discriminatory acts that are time-barred may still be considered in assessing defendants' intent with respect to employment actions taken within the limitations period. *Id.* at 113.

*4 Utilizing the framework set forth in *Morgan,* pay disparity claims are also considered discrete acts. The Supreme Court has reasoned that "[e]ach week's paycheck that delivers less to a [disadvantaged class member] than to a similarly situated [favored class member] is a wrong under Title VII, regardless of the fact that the pattern was begun prior to the effective date" of the statute. *Bazemore v. Friday,* 478 U.S. 385, 395-96 (1986).FN4 The Second Circuit has applied this reasoning to pay disparity claims under the Equal Pay Act. *See Pollis v. The New Sch. For Soc. Research,* 132 F.3d 115, 119 (2d Cir.1997) ("A

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 4
Not Reported in F.Supp.2d, 2005 WL 831665 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

cause of action based on receipt of a paycheck prior to the limitations period is untimely and recovery for pay differentials prior to the limitations period is barred irrespective of subsequent, similar timely violations.")

> FN4. Note, though, that in *Bazemore,* an employer sought to escape responsibility for pay disparities by claiming that they originated before the enactment of Title VII. The Supreme Court's reasoning thus held liable the employers that were historically the worst offenders of racial discrimination. Here, this reasoning serves to limit employer's liability.

Most courts in this district have found that the reasoning in *Pollis* applies to Title VII claims. *See, e.g., Hermandez v. Kellwood Co.,* No. 99 Civ. 10015(KNF), 2003 WL 22309326, at *14-15 (S.D.N.Y. Oct. 8, 2003) (" It is clear from *Morgan* and the relevant Second Circuit case law that ... the pay disparities ... are to be considered discrete acts and, therefore, cannot be lumped together to form a ' continuing violation." '); *Quarless v. Bronx-Lebanon Hosp. Ctr.,* 228 F.Supp.2d 377, 383 n .2 (S.D.N.Y.2002) (holding that in light of *Morgan, Pollis* applies to Title VII claims); *Gross v. Nat'l Broad. Co., Inc.,* 232 F.Supp.2d 58, 68 (S.D.N.Y.2002) (noting that *Morgan* is in accord with *Pollis* ).[FN5] Therefore, Hnot's pay disparity claims under Title VII are valid only for the period within the applicable limitations period. Defendants' motion for summary judgment is thus granted with respect to any pay disparity and promotion claims prior to October 30, 1998, and denied for all claims properly within the statute of limitations.

> FN5. Some district courts in the Second Circuit have held that evidence of disparate pay could constitute a continuing discriminatory policy, but these cases pre-date *Morgan. See, e.g., Brennan v. City of White Plains,* 97 Civ. 2709(RWS), at *5, 1998 WL 75692 (S.D.N.Y. Feb. 20, 1998). The Supreme Court in *Morgan* explicitly did not " consider the timely filing question with respect to ' pattern-or-practice' claims." *Morgan,* 536 U.S. at 115 n. 9. There is little case law post-*Morgan* regarding pattern or practice claims and their affect on the continuing violation doctrine. This opinion concerns only Hnot's individual claims and does not address the scope of pattern or practice claims in class suits.

III. *Merits of the Discrimination Claims*

A. *Legal Standard*

In Title VII discrimination cases, the courts have established a complex burden-shifting framework based on *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), to determine whether a plaintiff's claim survives summary judgment. First, the plaintiff must make a prima facie showing of discrimination. *Id.* at 802. A plaintiff has the initial burden of demonstrating that (1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft,* 336 F.3d 128, 137-38 (2d Cir.2003).

The burden of establishing a prima facie case is not onerous, and is frequently described as minimal. *Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997). *See, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993). No evidence of discrimination is needed, and showing a preference for a person not in the protected class is enough to raise an inference of discrimination. *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 153-54 (2d Cir.2000).

*5 Meeting the burden of establishing a prima face case " creates a presumption that the employer unlawfully discriminated." *Id.* at 154. The burden then shifts to the employer, who must articulate a legitimate, non-discriminatory reason for its adverse employment action. *McDonnell,* 411 U.S. at 802; *James,* 233 F.3d at 154. That burden " requires the defendant to produce admissible evidence showing ' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action," ' *Eatman v. United Parcel Serv.,* 194 F.Supp.2d 256, 263 (S.D.N.Y.2002), quoting *St. Mary's Honor Ctr.,* 509 U.S. at 507 (1993) (emphasis in original). If the employer fails to present such a reason, plaintiff prevails.

Once the employer articulates a non-discriminatory reason, the presumption " drops out of the picture." *St. Mary's Honor Ctr.,* 509 U.S. at 510-11. The plaintiff is then required to show that the proffered

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reason is a pretext for discrimination. _McDonnell, 411 U.S. at 804._ When the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court must " examin[e] the entire record to determine whether the plaintiff could satisfy his ' ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." ' _Schnabel v. Abramson,_ 232 F.3d 83, 90 (2d Cir.2000), quoting _Reeves v. Sanderson Plumbing Prods., Inc.,_ 530 U.S. 133, 143 (2000).[FN6]

> FN6. The state law claims here are analyzed under the same framework as Title VII claims. _See Song v. Ives Lab., Inc.,_ 957 F.2d 1041, 1046 (2d Cir.1992) (describing claims in New York); _Watkins v. Nabisco Biscuit Co.,_ 224 F.Supp.2d 852, 861 (D.N.J.2002) (examining claims in New Jersey).

### B. *Compensation Disparities*

Plaintiff meets her burden of establishing a prima facie case on compensation disparities. She is a female and thus a member of a protected class under Title VII, and was concededly qualified to be a Team Leader. Defendants do not dispute that plaintiff was paid less than all but one of her male peer Team Leaders (D. Mem. 8; Murphy Decl. ¶¶ 61-65, 71-72), an adverse treatment that intrinsically raises a suspicion of gender discrimination.

Defendants present non-discriminatory reasons for plaintiff's lower pay, and for her failure to receive raises in 1998 and 1999. Primarily, defendants argue that Hnot's salary was the highest in the New York and New Jersey offices when compared to her team's book of business, explaining that the Team Leaders who did receive raises in 1998 had salaries that were *low* in relation to their teams' book of business. (D. Mem. 21; Murphy Decl. Ex. J.)

Hnot raises significant factual issues that cast doubt on defendants' asserted non-discriminatory reasons for her lower pay and lack of raises. First, Hnot points to deposition testimony by one of defendants' own witnesses that is inconsistent with defendants' explanations of the criteria governing pay raises. For example, Murphy explained that he received oral instructions that salary adjustments were to be based on performance, with additional consideration given to internal equity and market offers. (Murphy Dep. 215-17.) Other evidence suggests additional discrepancies, such as an email discussing proposed raises for Team Leaders which notes that a raise to $148,000 ($2,000 more than Hnot's salary at that time; *see* Murphy Decl. ¶ 55) for a male Team Leader would put him at " the low end of the team leader scale," with no discussion of his salary as a proportion of his book of business. (Webber Decl. Ex. 32.)

**\*6** Additionally, while defendants point out that some men were also denied raises, these men do not fall into the pattern that defendants propose. For example, both in 1998 and 1999, some Team Leaders who received raises had *higher* salary/book of business ratios than those who did not. *See* D. Mem. 8 tbl. (showing that in 1998, a Team Leader with a salary/book of business ratio of 8.1% received a raise, while another Team Leader with 2.5% ratio did not; and that in 1999, a Team Leader with a ratio of 7.1% received a raise while a Team Leader with a ratio of 3.6% did not). Therefore, a reasonable factfinder drawing reasonable inferences in favor of plaintiff could conclude that defendants' proffered reasons for the denial of raises to Hnot are merely an after-the-fact rationalization to conceal discriminatory intent.

Defendants offer a similar rationale for plaintiff's claims of denial of bonuses. Defendants allege that Hnot's team did not reach its target in either of those years, and that she therefore did not qualify for a bonus. (Murphy Decl. ¶ 79.) Although a reasonable jury could accept defendants' justification, plaintiff provides evidence that would support a reasonable finding of discriminatory intent. Plaintiff contends that she was subjected to lesser staffing support and production assistance (Hnot Decl. ¶ 23, 25, 30, 70-71), disproportionately high production goals (*id.* at ¶ 44), and interference with her ability to retain and produce accounts (*id.* at ¶¶ 28, 41, 57). For example, John Kelly, REO of the Northeast Region and CEO of New York, indicates in his deposition testimony that he was generally responsible for hiring producers and for directing their assistance to certain Team Leaders. (Kelly Dep. 151-172; Hnot Decl. ¶¶ 70-71.) Nevertheless, he informed Hnot that she had to find her own production assistance. (*Id.*) If believed, this testimony lends support for an inference of discriminatory animus.

Similarly, other teams were four to six times the size of plaintiff's team, yet plaintiff had comparable production goals. *See* Rozic Aff., Ex. R; Hnot Decl. ¶ 44 (describing that Hnot had a production goal of

Not Reported in F.Supp.2d											Page 6
Not Reported in F.Supp.2d, 2005 WL 831665 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

$480,000 while the larger teams had goals of $500,000). These other teams also had production assistance that Hnot did not, both from producers assigned to the team, and from business referred by freestanding producers. (*Id.*) Defendants argue that these differences in treatment are not adverse employment actions. (D.Mem.19.) Plaintiff does not argue to the contrary; rather, she points out that this alleged discriminatory treatment by her employer had a direct impact on plaintiff's compensation. (P. Mem.13.) A reasonable factfinder might reject Hnot's rationalization for her allegedly low productivity and accept defendants' explanations for denying her bonuses, but would not be required to do so. Material factual issues are thus presented for trial.

Moreover, plaintiff does not simply challenge decisions on specific raises or bonuses, but also argues that she was paid too little overall. (Hnot Decl. ¶ 48-53; Webber Decl. Ex. 108 at tbls. A, B.) First, plaintiff presents statistical evidence that purports to show that high-level women at Willis in general were paid much less than comparable men. Statistical evidence may be used to establish a prima facie case under Title VII. *Robinson,* 267 F.3d at 158-59; *Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 604 (2d Cir.1986). Plaintiff's expert, Dr. Mark Killingsworth, analyzed officers and employees who held functional titles equivalent to officers. While controlling for the exact position held, employing company, years of service, education, and other factors, Dr. Killingsworth found statistically significant differences in both base salary and in total compensation. (Webber Decl. Ex. 107; Webber Decl. Ex. 108 at tbls. A, B.)

*7 Second, plaintiff also provides ample anecdotal evidence of pervasive sexism in the company culture. For example, plaintiff describes sexist jokes made by her male colleagues (Hnot Dep. 70), failure of senior management to take action after plaintiff received unwanted sexual contact by another officer (*id.* at 80-81), and a senior officer's comment that women could not be promoted into senior management " because women could not go out to dinner at night." (*Id.*)

Defendants argue that this evidence is insufficient to show gender bias by disputing Dr. Killingsworth's statistical analysis. (D. Reply 16, 18.) While defendants may have valid criticisms of the evidence, resolution of such factual issues is for the trier of fact at trial. Plaintiff's expert has used accepted statistical methods, and a reasonable factfinder could conclude that his testimony demonstrates gender discrimination in salaries and promotions at Willis.[FN7] Similarly, defendants' arguments that plaintiff's anecdotes mostly emanate from co-workers, are sometimes not gender-related, and are sporadic rather than pervasive (D. Reply 16), at best present factual disputes to be resolved at trial. Plaintiff has met her burden of producing evidence that raises a material issue of fact. A reasonable jury could find that her pay was lower due to gender bias and that defendants' proffered explanations were purely a pretext for discrimination.

> FN7. For a fuller discussion of the arguments over Dr. Killingsworth's analysis, see *Hnot,* 2005 WL 659475, at *2-6.

C. *Promotion, Demotion, and Termination Claims*

Plaintiff also has established a prima facie case that she was unfairly denied promotions due to gender discrimination. She is a woman who had sufficient paper qualifications for the New Jersey COO, New Jersey CEO, and New York COO positions. She was denied these positions, which were filled by men. See *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004) (outlining the requirements for establishing a prima facie case); *Mitchell v. N. Westchester Hosp.,* 171 F.Supp.2d 274, 277-78 (S.D.N.Y.2001) (finding that an inference of discrimination can be established by a showing that the position went to a person outside the protected group, and that plaintiff was qualified for certain positions in a " basic" sense due to his past positions).

Defendants contend that plaintiff was not qualified for the promotions, due to her lack of strong production or production management skills. (Murphy Dep. 333-35, 336-37.) They also point to the allegedly superior qualifications of Murphy and Sam Coburn, the men who successfully applied for the positions that Hnot sought. (D. Mem. 18-19; Murphy Dep. 11-16.) Whether a candidate is qualified for a position must be determined based on criteria that the employer has specified for the position. *Williams,* 368 F.3d at 126. Hnot disputes the job qualifications that defendants now put forth for the positions in question. (P. Mem.24-25.) However, even using defendants' criteria, which include a requirement of strong production skills, plaintiff has supplied adequate evidence that she was both experienced in management and capable in producing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 831665 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

new business. For example, Hnot was chosen for the Exceptional Producers Council in 1997 (Webber Decl. Ex. 67), a special conference for high-producing employees. (Webber Decl. Ex. 68.). She was also given the Chairman's Award in 1989 for overall excellence in performance. (Hnot Decl. ¶ 61.) As defendants argue, a plaintiff cannot rely on mere conclusory opinions that she was qualified. (D. Reply 5.) However, plaintiff does more than just state her opinion that she is qualified. She has produced substantive facts that create an issue of material fact. While defendants offer well-supported evidence of their reasoning, so does plaintiff.

**\*8** Plaintiff's claim concerning the failure to promote her to the New Jersey COO position, while time-barred, may serve as evidence of discriminatory intent. Title VII does not bar an employee from using prior acts as background evidence of intent in support of a timely claim. *Morgan,* 536 U.S. at 113. It is undisputed that plaintiff had more years of experience than Coburn, who was ultimately hired as New Jersey CEO, and the promotion of a man with less experience can be evidence for a jury finding that plaintiff was denied promotions due to her gender.

Defendants argue that plaintiff never properly applied for or expressed interest in these positions. (Hnot Dep. 87-88.) However, if a factfinder accepts plaintiff's allegation that she was advised not to apply, then her claim is not barred, as " a plaintiff's failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor." *Malarky v. Texaco, Inc.,* 983 F.2d 1204, 1213 (2d Cir.1993). In addition, if " an employee expresses to the employer an interest in promotion to a particular class of positions, that general expression of interest may satisfy the requirement that the employee apply for the position." *Williams,* 368 F.3d at 129. Plaintiff had previously expressed her interest in a CEO position to several senior managers. (Hnot Decl. ¶¶ 13-16.) Therefore, defendants' argument is unpersuasive.

As for plaintiff's demotion and discharge claims, defendants claim that plaintiff was simply one of numerous employees who were terminated as part of a staff reduction stemming from the objective, nationwide BPR process. (Murphy Decl. ¶¶ 30-33.) Hnot, though, raises genuine issues as to whether the BPR process was objectively applied. Plaintiff and defendants dispute whether plaintiff's team was profitable or not. (*See* D. Mem. 16; P. Mem. 27.) Hnot also alleges that even if the New Jersey office was unprofitable, there was no persuasive explanation for terminating Hnot instead of the one Team Leader that Willis retained in New Jersey. (P. Mem.28.) Viewed in the light most favorable to plaintiff, the BPR process could be viewed as merely a pretext for removing plaintiff.

Plaintiff's statistical evidence adds further support for an inference of discriminatory intent. The entire record must be examined to determine whether a plaintiff has satisfied her burden. *See Schnabel,* 232 F.3d 83, 90 (2d Cir.2000) (explaining that the strength of plaintiff's prima facie case, proof that employer's explanation is false, and other evidence are all appropriate in considering a summary judgment motion). Here, the statistical evidence, along with plaintiff's evidence of her employer's efforts to undermine her ability to perform her job duties, could support a reasonable finding of long-term pay discrimination against Hnot and women in general, and a pattern of excluding women, including Hnot, from the company's higher ranks. The failures to promote and eventual demotion thus could be found to be intentionally discriminatory. There is sufficient evidence to prelude summary judgment on plaintiff's promotion and demotion claims.

### IV. *Retaliation Claims*

**\*9** Defendants allege that plaintiff's retaliation claim fails as a matter of law. To establish a prima facie case of unlawful retaliation under Title VII, Hnot must show that (1) plaintiff participated in a protected activity; (2) defendant was aware of the activity; (3) plaintiff experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004).

Here, plaintiff easily meets the first three criteria of the prima facie case. Her report to the EEOC is a protected activity, Willis was made aware of the activity (Murphy Dep. II 52-53), and plaintiff was ultimately terminated. Defendants argue, however, that no causal connection exists between plaintiff's filing of her EEOC charge on August 26, 1999, and her subsequent termination seven months later on March 22, 1999. (D.Mem.24.) Courts are reluctant to infer retaliation where an adverse action takes place long after the filing of a charge. *See, e.g., Ponticelli*

Not Reported in F.Supp.2d                                                                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 831665 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

v. Zurich Am. Ins. Group, 16 F.Supp.2d 414, 436 (S.D.N.Y.1998) (finding no causal connection after two and a half months). However, plaintiff argues that Murphy first decided that it would be a mistake to terminate plaintiff, but that he recommended her termination merely one and a half months after he learned of the EEOC charge. *See* Murphy Dep. 55-56 (recommending in an email on December 17, 1999 that Hnot be terminated). Viewing the evidence favorably to the plaintiff, a reasonable jury could accept that argument. The prima facie case is thus established.

As with plaintiff's demotion claim, defendants argue that plaintiff's termination resulted from the BPR process, and not from retaliation for the EEOC charge. (D.Mem.25.) That explanation is plausible, but so are plaintiff's allegations that any low ranking she received in the BPR process stemmed from systematic discriminatory interference with her job duties. Moreover, the " skill/will assessment" that determined Hnot's BPR rating was conducted by Murphy. (Mathieson Dep. 41, Ex. 106.) Defendants' reference to the BPR process could be thus viewed by a factfinder as a pretext, and defendant's motion to dismiss plaintiff's retaliation claim is therefore denied.

## CONCLUSION

Defendants' motion for summary judgment is denied with respect to all of plaintiff's timely claims of sex discrimination in violation of Title VII and state law, regarding compensation disparities, failure to promote, demotion, and retaliation. Defendant's motion is granted as to all claims with respect to pay disparity and failure to promote claims that are time-barred.

SO ORDERED:

S.D.N.Y.,2005.
Hnot v. Willis Group Holdings Ltd.
Not Reported in F.Supp.2d, 2005 WL 831665 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.