**Westlaw.**

Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

H
White v. Whitman
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Inetha WHITE, Plaintiff,
v.
Christie Todd WHITMAN, in her official capacity as Administrator, EPA; and the Environmental Protection Agency, Defendants.
**No. 99 Civ.4777(FM).**

April 26, 2002.

Michael A. Hardy, Scheurer, Wiggin, & Hardy, L.L.P., New York City, for Plaintiff.
Michael M. Krauss, Asst. U.S. Atty., New York Ciy, for Defendant.

*MEMORANDUM DECISION*
MAAS, Magistrate J.

I. *Introduction*

*1 The defendants, Christie Todd Whitman, Administrator of the Environmental Protection Agency, and the Environmental Protection Agency (collectively the " EPA" ), have moved for summary judgment, pursuant to Fed.R.Civ.P. 56, dismissing all of the remaining claims brought by plaintiff Inetha White (" Ms.White" ) in this employment discrimination action.FN1 For the reasons set forth below, the EPA's motion is granted, and the Clerk of the Court is directed to close the case.

> FN1. Pursuant to Fed.R.Civ.P. 25(d)(1), Ms. Whitman has been substituted for Carol M. Browner as the Administrator of the Environmental Protection Agency.

II. *Procedural History*

Ms. White commenced this action on July 12, 1999 by the filing of a complaint. (Docket No. 1). The following month, an amended complaint (" Amended Complaint" or " Am. Compl." ) was filed. (Docket No. 2). In her Amended Complaint, Ms. White alleged that the EPA discriminated against her because of her age, sex, color, and race. (*See, e.g.,* Am. Compl. ¶ 54). The Amended Complaint further alleged that the EPA retaliated against Ms. White because she had filed several EEO complaints protesting this unlawful conduct. (*Id.* ¶ 65).

On January 18, 2000, with the consent of all parties, Judge Koeltl referred this case to me for all purposes pursuant to 28 U.S.C. § 636(c)(1). Thereafter, the EPA moved, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(c), for an order dismissing many of Ms. White's claims. On September 27, 2000, that motion was granted in part and denied in part. *See White v. Browner,* No. 99 Civ. 4777, 2000 WL 1425096 (S.D.N.Y. Sept.27, 2000). As a consequence, the only claims that remain in this lawsuit are that the EPA violated Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.,* and the Age Discrimination in Employment Act (" ADEA" ), 29 U.S.C. § 621, *et seq.,* by (a) failing to promote Ms. White prior to the April 18, 1995 date of her administrative complaint, and (b) retaliating against her for filing that complaint and a second one later in 1995.

III. *Facts*

A. *Discrimination Claim*

Ms. White is an African-American woman who was born in 1943. (White Dep. at 11, 12). She began working for the federal government in 1966 and joined the EPA's New York regional office in 1974, only a few years after the agency was established by Congress. (*Id.* at 9, 24-32). Ms. White began her EPA career as a GS-5 permit clerk. (*Id.* at 31). In 1990, she was promoted through competitive selection to a GS-7 Environmental Protection Specialist (" EP Specialist" ) position. (*Id.* at 45). The promotion track for this position was capped at the GS-11 level. (*Id.* at 48-49; EPA Ex. D). Ms. White was promoted to the GS-9 level in 1992 and to the GS-11 level the following year. (White Dep. at 45, 80). Having reached the maximum grade for her title, Ms. White had no potential for further promotion unless she was competitively selected for a higher position or her job was reclassified to a higher level because her duties had increased. (EPA Exs. D, I).

Until 1996, Ms. White was employed in the Program Administration Section of the Water Permits and Compliance Branch, which, in turn, was part of the Water Management Division of the EPA. She reported to Aristotle Harris, the Section Chief, who reported to Patrick Durack, the branch chief. During this period, she received evaluations indicating that she met or exceeded

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

expectations; she also was given several awards for her work. (White R. 56.1 Stmnt. ¶ 3; White Dep. at 132-33). Although documents indicate that Ms. White's job as an EP Specialist originally entailed a fair amount of contact with the public, (see White Ex. 6; EPA Ex. K at 3), by the time she reached the GS-11 level most of her responsibilities related to the entry of data concerning water pollution permits into a computerized database. (White Dep. at 66, 77).

*2 After reaching the maximum grade level for her title, Ms. White evidently grew dissatisfied with her inability to advance further. On April 18, 1995, she filed a formal EEO complaint alleging that the EPA had discriminated against her on the basis of her age, race, and color by failing to promote her to a GS-12 position. (EPA Ex. E; Williams Decl. ¶ 2). On October 19, 1995, she filed a second EEO complaint of discrimination based upon the EPA's failure to reimburse certain of her tuition expenses.[FN2] (EPA Ex. F; Williams Decl. ¶ 2).

> FN2. My earlier decision in this case dismissed Ms. White's Amended Complaint insofar as it sought to rely on this latter EEO complaint because she had failed to plead facts showing that she had exhausted her administrative remedies. *White v. Browner,* 2000 WL 1425096, at *4.

On December 4, 1998, Chief Administrative Judge Chu concluded that Ms. White had failed to make out a prima facie case with respect to the failure to promote claim because (i) there was no evidence that she ever applied for a GS-12 position, and (ii) a "desk audit" of her responsibilities confirmed that she was not performing any tasks beyond those contemplated by her existing position description.[FN3] (EPA Ex. M at 5-8). In his decision, Judge Chu noted that the only EP Specialist promoted to a GS-12 position in the Water Management Division between January 1, 1993 and January 1, 1995 was another African-American female. (*Id.* at 7). Judge Chu also noted a "comparator" white employee was in fact already a GS-12 when she transferred to the EPA from another agency. (*Id.*).

> FN3. The desk audit was performed by Robert Rubel, an EPA Personnel Specialist, who interviewed Ms. White and several of her supervisors. Two of those supervisors also submitted affidavits as part of the EEO investigation which reaffirmed their view that Ms. White was not being asked to perform any out-of-title work. (EPA Exs. I at 2, J at 5).

Judge Chu also concluded that there was no basis for a retaliation claim because the record was devoid of any evidence that Ms. White was engaged in EEO-protected activity or that her complaints to her supervisors about the EPA's failure to promote her raised allegations of discrimination. (*Id.* at 5).

The EPA issued its Final Agency Decision adopting Judge Chu's findings on April 2, 1999. (*Id.* Ex. N).

In July 1996, while Ms. White's April 1995 failure to promote complaint was pending, the EPA undertook a major reorganization which led to the dissolution of the Water Management Division and the creation of a Compliance Assistance Program Support Branch ("CAPS Branch") within a new Division of Enforcement and Compliance Assistance ("DECA"). Ms. White was reassigned to a "Data Management Team" ("DTM") within the CAPS Branch, where the bulk of her duties, as before, related to the entry of data into, or the retrieval of data from, the computerized data base. (*Id.* Ex. O at 14-15). Following her transfer, Ms. White's immediate supervisor was Patrick Harvey, Chief of the CAPS Branch. (White Dep. at 83; Harvey Dep. at 5). Harvey is a white male born in 1941. (EPA R. 56.1 Stmnt. ¶ 30). Ms. White generally received her assignments from Dit Cheung, a DTM team leader, who had some limited management duties but was not considered a supervisor by the EPA. Cheung is an Asian American who apparently was over the age of 50 at the time he became a DTM team leader. (Harvey Dep. at 13).

By 1998, the DTM consisted of the following nine employees:

| Name | Grade | Position | Race/Ethnicity | Age |
|---|---|---|---|---|
| Dit Cheung | GS-13 | Team Leader | Asian-American | 53 |
| Robert Carvalho | GS-12 | Environmental | White | 67 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

| Name | Grade | Position | Race/Ethnicity | Age |
|---|---|---|---|---|
| | | Scientist | | |
| Inetha White | GS-11 | EP Specialist | African-American | 55 |
| Donald Palmer | GS-11 | Environmental Scientist | White | 33 |
| Laureene Jackson | GS-7 | EP Assistant | African-American | 40 |
| Nestor Louis | GS-7 | EP Assistant | Latino | 29 |
| Linda Caldwell | GS-6 | EP Assistant | African-American | 49 |
| Victoria Padron | GS-6 | EP Assistant | White | 37 |
| Perisa Harrison | GS-5 | Team Secretary | African-American | 28 |

*3 (*See* White Dep. at 114-15, 150-51, 176-77; Harvey Dep. at 8, 12-21, 25-28, 71-72, 127-32; Cheung Dep. at 28-31, 36-37.).

| Name | Grade | Position | Race/Ethnicity | Age |
|---|---|---|---|---|
| Jehuda Menczel | GS-14 | Environmental Scientist | White | 62 |
| Joseph Clore | GS-13 | Record Management Analyst, Program Support Team | African-American | 48 |
| Norman Rost | GS-13 | Program Coordinator, Program Support Team | White | 44 |

(*See* White Dep. at 53; Harvey Dep. at 9, 12-21, 66-67, 71-72, 127-32; Cheung Dep. at 26-27, 94).

The CAPS Branch also included a Compliance Assistance Section, headed by John Gorman. (Harvey Dep. at 6-10).

| Name | Grade | Position | Race/Ethnicity | Age |
|---|---|---|---|---|
| John Gorman | GS-14 | Section Chief | White | 38 |

In 1998, in addition to personnel assigned to the DTM, Harvey served as the first-line supervisor of three other employees in the CAPS Branch who had substantive responsibilities: Those employees were as follows:

Gorman was the first-line supervisor of the employees in his section, and Harvey was their second-line supervisor. *Id.* The employees in the Compliance Assistance Section in 1998 were as follows:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03498-AKH    Document 7-14    Filed 07/02/2007    Page 4 of 13

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

| John Wilk | GS-13 | Environmental Scientist | White | 39 |
| Diane Buxbaum | GS-12 | EP Specialist | White | 60 |
| Luz Garcia | GS-12 | Environmental Scientist | Latina | 41 |
| Deborah Craig | GS-12 | Environmental Scientist | White | 43 |
| Ron Lockwood | GS-12 | EP Specialist | African-American | 34 |
| Jeannette Dadusc | GS-12 | EP Specialist | White | 28 |
| Auria Cruz | GS-5 | Section Secretary | Latina | 31 |

(*See* White Dep. at 152, 154-55; Harvey Dep. at 9, 12-21, 71-72, 127-32).

B. *Retaliation Claim*

In the years following the reorganization, Ms. White and the EPA grew increasingly disenchanted with one another. The EPA's dissatisfaction ultimately led to her suspension for a five-day period in March 1998 and her termination in August 1998. Ms. White contends that both of these actions were undertaken in retaliation for her earlier EEO complaints. She also contends that she was subjected to a hostile work environment.

1. *Ms. White's Suspension*

On October 29, 1997, Conrad Simon, the DECA Director, who is an African-American male, sent Ms. White a notice that he proposed to suspend her for five calendar days because her " pervasive, insubordinate behavior and willful disregard for proper management/supervisory directives ha[d] not abated, despite repeated supervisory attempts to correct [her] behavior." (EPA Ex. U at 3). Simon's memorandum specified five bases for this proposed disciplinary action. Included among these grounds were Ms. White's alleged " [r]efusal to submit a BiWeekly Accomplishments and Activities LAN [Message]," " [r]efusal to answer work related questions [from a] supervisor or giving non-responsive answers to work status/activity questions," and inappropriate conduct during an incident involving Gorman. (*Id.* at 1-3). After Ms. White failed to submit a timely answer to the Simon proposal, her suspension was approved on March 9, 1998, by William J. Muszynski, the EPA Deputy Regional Administrator. (EPA Ex. DD). Thereafter, Ms. White was precluded from working from March 23 through 27, 1998. (*Id.*).

*4 The refusal to a submit biweekly LAN message specification grew out of a requirement, imposed by Harvey, that EPA employees reporting directly to him prepare and send brief weekly emails setting forth their projects during the prior two weeks and the percentage of their time devoted to those projects. (*See id.* Exs. R at 1-2, S at 1-3). Harvey advised the employees that he supervised of this requirement in a March 17, 1997 email, reiterated the need to submit the emails in an April 24, 1997 email, and had his secretary send biweekly reminder emails to his first line reports. (*Id.* Exs. R at 1-2, S at 1-3; Harvey Dep. at 56, 60). A handful of employees who had frequent contact with Harvey were exempted from this reporting requirement. (Harvey Dep. at 56-57, 61). Ms. White was not one of those employees. (*Id.*).

At her deposition, Ms. White maintained that she never saw the initial email from Harvey announcing the biweekly reporting requirement. She also claimed uncertainty as to whether she received any of the subsequent emails from Harvey or his secretary. She conceded, however, that she was aware of the reporting requirement. (White Dep. at 253-54, 256, 261-62).

According to Harvey, Ms. White was the only one of his direct supervisees required to submit a biweekly report who failed to do so. (Harvey Dep. at 60). At her

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 5
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

deposition, Ms. White claimed that she " may have" submitted an occasional response to a request for a biweekly report. (White Dep. at 255). None of those alleged reports, however, were produced in discovery, even though Ms. White testified that she would have preserved such reports and given them to her counsel. (*Id.* at 265-66). Ms. White also testified that she told Harvey that she would comply only if she received " a memo from the president or from D.C." imposing the reporting requirement. (*Id.* at 259). She contends that this strong stance was justified because she was being " singled out" " by being the only employee in the CAPS [B]ranch who was required to comply." (White R. 56.1 Stmnt. at 22).

The refusal to answer questions specification stems from Ms. White's attendance at a meeting on June 2, 1997 with Harvey and Chung concerning her 1997 Mid-(Fiscal) Year Review. According to Harvey, during that meeting, Ms. White refused to answer questions regarding the status of her projects. (EPA Ex. U; *see also id.* Attach. 7). Additionally, Ms. White allegedly refused Harvey's request that she go to her desk to check the status of certain of her work assignments. (*Id.*). In a grievance protesting her eventual suspension, Ms. White contended that, despite a degree of " uneasiness" between her and her supervisors, she had " answered all their questions to the best of my ability and ... tried to get the most productivity out of this meeting." (White Ex. 18).

The notice of Ms. White's proposed suspension also indicated that she had failed to attend two previously-scheduled performance reviews. Although Ms. White complains that these meetings conflicted with meetings that she had arranged with her EEO representatives, (White Mem. at 7-8; White Ex. 18 at 1), it is undisputed that she never advised her EPA superiors of the nature of the conflict before failing to appear. Moreover, once Harvey learned of the scheduling problem, he sent an email to his staff advising them that EPA employees may meet with their EEO counselors during business hours provided that they " advise their superior of the need to contact the aforementioned and give the supervisor an estimated duration of their expected absence." (EPA Ex. U Attach. A2). His email further indicated that employees would not be requested to discuss the substance of their EEO issues with their supervisors. (*Id.*).

*5 The incident with Gorman referred to in Simon's notice occurred on July 9, 1997, while Havey was away. On that date, Ms. White allegedly refused to accept an assignment from Gorman, who had identified himself to her as the Acting Branch Chief. (*Id.* Ex. U at 2-3). Gorman contended that Ms. White injured his shoulder as she was exiting her cubicle while he was trying to give her a work assignment. (*Id.* Attach. A8). In a memo regarding the incident, Ms. White denied that there was a physical confrontation. (EPA Ex. CC). She also observed that Gorman had " no supervisory authority that gives him the right to give me orders or to be rude to someone who is his senior." (*Id.*).

2. *Ms. White's Termination*

By memorandum dated June 4, 1998, Walter Mugdan, the Acting Director of DECA, notified Ms. White that he proposed to remove her from her federal position because of " numerous repeated, flagrant and uncorrected instances of insubordination." (*Id.* Ex. W at 1). The memorandum specified seven acts of insubordination, arising out of Ms. White's alleged (i) failure to comply with Harvey's directive that she make the travel arrangements necessary for her to attend certain training in Washington, D.C.; (ii) failure to attend that training; (iii) absence without leave on that date of the training; (iv) continued failure to submit bi-weekly reports; (v) continued refusal to answer work status inquiries from Cheung and Harvey; (vi) refusal to accept a work assignment from Harvey; and (vii) failure to answer questions from Harvey about the status of her work during a 1998 performance evaluation. (*Id.* at 1-7). Ms. White claims that all seven bases for her termination are pretextual. (White Mem. at 16). She also contends that Karen Maples, an EPA hearing clerk, informed her that Mugdan was named Acting Director " to get rid of two employees," one of whom was her. (White Dep. at 100-01).

The first three specifications relate to Ms. White's conceded failure to attend a one-on-one training session regarding the computerized EPA database. Since at least 1997, Ms. White repeatedly had requested that her supervisors provide her with instruction and training relevant to her duties. (*See* EPA Exs. AA, BB, GG). In response to these requests, Harvey and Cheung scheduled a special training session for her on March 28, 1998 in Washington, D.C. On May 14, 1998, Harvey sent Ms. White an email directing her to contact his secretary for assistance in making the travel arrangements for this trip. (*Id.* Ex. V; White Dep. at 237, 249-50; Harvey Dep. 47, 54-55). He reminded Ms. White about this training and the need to make travel arrangements in a May 22, 1998 follow-up email. (EPA Ex. W Attach. B). Despite these communications, Ms. White waited until the day before the scheduled training to submit a request for leave form in which she indicated that she would be " undergoing medical, dental or optical examination or treatment" the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03498-AKH   Document 7-14   Filed 07/02/2007   Page 6 of 13

Not Reported in F.Supp.2d                                                                                   Page 6
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

following day. (*Id.* Attach. C). Harvey rejected her leave request because it conflicted with the training session and was not supported by sufficient information. (*Id.*) Ms. White then submitted the leave request to Mugdan, explaining that Harvey " does not wish to sign it." (*Id.* Ex. YY). Mugdan also denied her request, noting that she had failed to " provide any information documenting that it was necessary for [her] to schedule a medical appointment for the same date." (*Id.*). Despite the two denials of her leave request, Ms. White did not report to work on May 28, 1998. (*Id.* at 4).

*6 Ms. White does not contest the EPA's chronology chronology concerning the May 28th training, but contends that she had a " legitimate medical reason" for not traveling to Washington-namely, a preexisting apointment with her gynecologist. (White Mem. at 15; *see also* White Dep. at 239). However, Ms. White never advised her supervisors of this apointment until May 27th. (White Dep. at 242-44). Moreover, on the afternoon of Friday, May 22, 1998, Ms. White visited her primary care physician, who provided her with a note which explained that " [i]t took several weeks to make this appointment and I have encouraged her not to postpone it again." (EPA Ex. VV). Although Ms. White gave the note to her EEO counselor on May 27th, (White Dep. at 245), she never gave a copy of it to Harvey or Mugdan. (*Id.* at 243, 246).

The fourth specification refers to Ms. White's continuing refusal to submit bi-weekly reports even after the EPA had suspended her for failing to do so. Ms. White's rejoinder to this allegation is that " the government cannot establish that [she] was the only person who did not submit reports" because the EPA failed to preserve the reports after conducting its annual employee reviews. (*See* EPA Mem. at 16; Harvey Dep. at 59).

The fifth and sixth specifications relate to Ms. White's handling of a work assignment that she received from Cheung. In an October 30, 1997 email to Ms. White, Cheung listed five permits which had to be entered into the EPA database and advised Ms. White that they were being forwarded to her under separate cover. (EPA Ex. EE). Cheung concluded the email as follows: " Please try to have all of these completed by 12/15/97. If you have [a] problem meeting the due date let me or Pat Harvey know, Thanks." (*Id.*). After learning that Ms. White had failed to complete the assignment by January 22nd, Cheung spoke with her, learning that she allegedly had never received the permits. (*See id.* Ex. W at 5; *see also* White Dep. at 303-05). In a subsequent email, Cheung instructed Ms. White to ask his secretary for a copy of the permits if she was unable to locate them. (EPA Exs. W (Attach.O), FF). He also directed her to make this project her " top priority" and to complete it within two weeks. (*Id.*). On February 2, 1998, however, Ms. White emailed Cheung stating, " The permits listed in your memo of 1/22/98 were never received by me." Ms. White also complained that she had previously " requested training for *all* assigned work" and was " being single[d] out" and denied training provided to employees with less seniority. (*Id.* Ex. GG)(emphasis added).

Following the February 2nd email, both Harvey and Cheung met with Ms. White on February 5, 1998, to determine the status of her assignments. Rather than responding to all of Harvey's questions, however, Ms. White instructed him to put them in writing because she was " very annoyed with him" and " didn't trust him." (White Dep. at 313-14). At the end of the meeting, when Harvey attempted to hand Ms. White the five permits that she had been asked to input, she refused to accept them, instructing Harvey to put them in her " in box" instead. (EPA Ex. W. at 7; White Dep. at 317-18).

*7 The last specification in Mugdan's memo relates to Ms. White's alleged refusal to answer Harvey's questions about the status of her work on the five permits during a performance review on April 28, 1998. (EPA Ex. W at 7). The EPA contends that Ms. White refused to answer despite repeated directives to do so. (*Id.*). Ms. White claims that she did answer most of Harvey's questions about the permits, either at this meeting or another one, but refused to answer questions concerning another topic before checking with her attorney. (White Dep. at 322-23).

### 3. *Other Retaliatory Acts*

Ms. White suggests that the EPA also retaliated against her by refusing to give her advances for her travel expenses in connection with certain training sessions. (White Mem. at 13). In 1997, Ms. White was sent to a four-day air pollution training session in North Carolina in an effort to help her expand her responsibilities. (Cheung Dep. at 62-66). The controversy concerning travel expenses subsequently arose in early 1998, when Harvey and Cheung recommended Ms. White for additional air pollution training in New Jersey. After Ms. White requested an advance for the cost of traveling to that nearby location, Harvey contacted the " people in finance" in an effort to assist her, but was told that it was EPA policy not to grant such advances for local nonovernight travel. (Harvey Dep. at 107). Although Ms. White contends that the EPA routinely waived this policy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03498-AKH   Document 7-14   Filed 07/02/2007   Page 7 of 13

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

for other employees, (White Mem. at 14), it appears that the employees who were granted such waivers were either required to work beyond their normal duty hours or to stay overnight at the nearby locations to which they had traveled. (*See* Supplemental Decl. of Michael M. Krauss, Esq., dated August 13, 2001, Ex. A at 2-3). Ms. White has not alleged that she faced such special circumstances.

Ms. White further alleges that she was twice denied promotion to the GS-12 level in retaliation for her EEO complaints. Ms. White applied for two GS-12 positions: NDEU 95-10, Program Analyst GS-12, and 95-27, Personnel Management Specialist GS-12. (White Rule 56.1 Stmnt. ¶ 14; White Ex. 11; White Dep. 222-23). Ms. White submitted the first of these applications in March or April of 1994. (EPA R. 56. 1 Stmnt. ¶ 24). She alleges that she was denied both promotions because of her race and prior complaints about not being promoted. (White Rule 56. 1 Stmnt ¶ 15; White Dep. at 220, 226). The EPA contends that the promotions were denied because she was not the best qualified applicant for either position. (EPA R. 56. 1 Stmnt. ¶¶ 24, 26).

Finally, Ms. White alleges that the EPA also retaliated against her by subjecting her to a hostile work environment. She contends that the conditions under which she was required to work were so abusive that they caused a " materially adverse change" in her workplace environment. (White Mem. at 26-27).

IV. *Discussion*

By virtue of my earlier decision in this case, only two of Ms. White's claims remain for consideration: *first,* that the EPA discriminated against Ms. White by failing to promote her prior to the filing of her April 1995 EEO complaint; *second,* that the EPA retaliated against her for filing both that complaint and a second unexhausted complaint related to the EPA's failure to reimburse some of her college tuition expenses. *White,* 2000 WL 1425096, at *2, *3.

A. *Summary Judgment Standard*

*8 Summary judgment may not be granted unless " the pleadings, depositions, answers to interrogatories, and admissions on file, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998); Fed.R.Civ.P. 56(c). However, if the court concludes that " the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no ' genuine issue for trial," ' and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)(quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). In making this determination, the court must " draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine,* 501 U.S. 496, 520, 111 S.Ct. 2419, 2435, 115 L.Ed.2d 447 (1991).

The Second Circuit has cautioned that summary judgment is often inappropriate in Title VII or ADEA cases because the trier of fact will have to delve into an employer's intent, an issue as to which direct evidence rarely is available. *See, e.g., Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994); *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984). Nevertheless, when the employer has explained its conduct, and the plaintiff has offered only conclusory assertions in opposition, summary judgment is appropriate. *See e.g., Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)(" To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases." ).

B. *Failure to Promote*

To establish a prima facie case of race discrimination based upon a failure to promote, a plaintiff must show that (1) she belongs to a protected class, (2) she applied and was qualified for a position for which her employer was soliciting applicants, (3) she was denied the job, and (4) a person not of the protected class was hired instead. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973); *Howley v. Town of Stratford,* 217 F.3d 141, 150 (2d Cir.2000); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997). As many courts have noted, this preliminary threshold is not difficult to meet. *See, e.g., Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-54, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981)(burden on plaintiff is " not onerous" ); *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 401 (2d Cir.1998)(describing the burden as " de minimis" ). Indeed, the prima facie case " requires no evidence of discrimination." *James v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000).

*9 Once a plaintiff has made the necessary minimal showing, the burden of production shifts to the employer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03498-AKH    Document 7-14    Filed 07/02/2007    Page 8 of 13

Not Reported in F.Supp.2d                                                                                                           Page 8
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

to proffer a legitimate nondiscriminatory reason for its action. *Fisher,* 114 F.3d at 1335. If the employer meets this requirement, the presumption arising out of the prima facie showing drops out of the case, and the burden of persuasion then rests with the plaintiff to establish a Title VII violation. *Id.* at 1336.

At this stage, the " plaintiff then has the opportunity to demonstrate ' that the proffered reason was not the true reason for the employment decision,' and that race was." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507-08, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993)). In other words, the burden shifts back to the plaintiff to prove that the " discrimination was the real reason for the employment action." *Graham v. LIRR,* 230 F.3d 34, 38 (2d Cir.2000).

In its *en banc* decision in *Fisher,* the Second Circuit indicated that an explanation by the employer which is pretextual " is not always sufficient to sustain an ultimate finding of intentional discrimination." *Fisher,* 114 F.3d at 1338. This holding, however, was called into doubt by the Supreme Court's subsequent decision in *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), which many commentators read to overrule *Fisher* and virtually preclude the granting of summary judgment to an employer in circumstances where the employee could establish both a prima facie case *and* that the employer's asserted rationale for the adverse employment action was pretextual. *See, e.g.,* Tamara Loomis, ' *Pretext Plus' Rejected -Employment Discrimination Landscape Changed,* N.Y.L. J ., June 22, 2000, at 5.

Subsequently, in *James,* the Second Circuit sought to harmonize its decision in *Fisher* with *Reeves.* As Judge Leval summarized the applicable case law, " once a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *Id.* at 156. This requires a case-by-case analysis of the evidence " to determine whether it reasonably supports an inference of the facts plaintiff must prove -particularly discrimination." *Id.* at 157. Stated somewhat differently, the court must " examin[e] the entire record to determine whether the plaintiff could satisfy his ' ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Uddin v. New York City,* Nos. 99 Civ. 5843 & 00 Civ. 3417, 2001 WL 15694, at *3 (S.D.N.Y. Jan.8, 2001)(Lynch, J.)(quoting *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000)(in turn quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106)). *See also Zimmerman v. Associated First Capital Corp.,* 251 F.3d 376, 382 (noting that " [t]he task ... is to examine the entire record and, in accordance with *Reeves,* make the case-specific assessment as to whether a finding of discrimination may reasonably be made" ).

*10 In this case, it is undisputed that Ms. White is an African-American woman and, therefore, a member of a protected class. Moreover, her request for a desk audit of her responsibilities was, in effect, an application for promotion to a specific position. It also is undisputed that Ms. White was denied a reclassification of her position following the completion of the desk audit. She consequently has met the first three elements of a prima facie failure to promote claim. There is no evidence, however, that someone who was not of a protected class was promoted to a GS-12 position in Ms. White's stead. Indeed, the only person in her department who was promoted between the year of Ms. White's last promotion and the date of her first EEO complaint was an African-American female. (EPA Ex. M at 7).

Moreover, even if Ms. White had established a prima facie case, the EPA has proffered the report of its desk audit as a compendium of its allegedly nondiscriminatory reasons for declining to grant Ms. White the promotion she requested. Accordingly, Ms. White bears the burden of establishing that the evidence, taken as a whole, would permit a reasonable finder of fact to conclude that the EPA had discriminated against Ms. White by failing to promote her to a GS-12 level position. Ms. White has failed to adduce any evidence, however, to suggest that the results of the desk audit were in any way influenced by improper considerations of race, color, or age. She also has failed to establish that she was treated any differently than other similarly-situated employees. The EPA consequently is entitled to summary judgment on Ms. White's claim that the failure to promote her in 1995 in response to her request for a desk audit was discriminatory.

*B. Retaliation Claims.*

1. *Prima Facie Case*

Even if Ms. White's failure to promote claim lacks merit, Title VII and the ADEA both make it illegal for an employer to retaliate against an employee for exercising her statutory right to complain about conduct that she considers discriminatory. *See Cifra v. Gen. Elec. Co.,* 252

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03498-AKH   Document 7-14   Filed 07/02/2007   Page 9 of 13

Not Reported in F.Supp.2d                                                                                                Page 9
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

F.3d 205, 216 (2d Cir.2001)(Title VII); *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 94 (2d Cir.2001)(ADEA). See also *Davis v. State Univ. of N.Y.,* 802 F.2d 638, 642 (2d Cir.1986)(" A finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint." ).

To make out a prima facie case for retaliation under either statute, Ms. White must show that (a) she participated in a protected activity, (b) the EPA knew of this activity, (c) she was subjected to an adverse employment action, and (d) there was a causal connection between the protected activity and the adverse employment action. *Slattery,* 248 F.3d at 94; *Holt v. KMI-Communications,* 95 F.3d 123, 130 (2d Cir.1996). The last of these elements can be established: (a) " *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant;" or (b) " *indirectly* by showing that the protected activity was followed closely by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987)(emphasis in original).

*11 Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to set forth the specific nondiscriminatory reasons it took the action alleged to be retaliatory. *Slattery,* 248 F.3d at 94-95. This burden is simply one of production. *Reeves,* 530 U.S. at 141, 120 S.Ct. at 2106. If it is met, to survive summary judgment, the plaintiff must produce evidence which would permit a reasonable finder of fact to conclude " that retaliation ' played a motivating role in, or contributed to, the employer's decision." ' *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000)(quoting *Renz v. Grey Adver., Inc.,* 135 F.3d 217, 222 (2d Cir.1997)); *see also Donlon v. Group Health Inc.,* No. 00 Civ. 2190, 2001 WL 111220, at *4 (S.D.N.Y. Feb.8, 2001)(Mukasey, J)(quoting *Gordon* ).

In this case, it is undisputed that Ms. White filed two EEO complaints in 1995 and that the EPA was aware of these filings. It also cannot seriously be disputed that her suspension and later termination constituted adverse employment actions.[FN4] Thus, the central question is whether Ms. White can establish the requisite causal link between her known protected activities and the adverse actions later taken against her by the EPA. In that regard, Ms. White has failed to produce any direct evidence of retaliatory animus on the part of the EPA. For example, she has not pointed to any statements by any decision maker which suggest that she was treated differently because of her decision to file two EEO complaints.

Indeed, following the 1996 reorganization, Ms. White was not even being supervised by the individuals whom she had named in those complaints.

> FN4. In her papers, Ms. White alleges that certain other actions on the part of the EPA also constituted adverse employment actions. To establish that something is an adverse employment action, a plaintiff must show that she has experienced " ' a materially adverse change' in the terms and conditions of employment." See *Galayba v. N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)(quoting *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999)). As the Second Circuit has noted, an adverse employment action is not defined " solely in terms of job termination or reduced wages or benefits." See *Wannamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). Nevertheless, " [t]o be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabaya,* 202 F.3d at 640 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)).
> Judged by this standard, the EPA's failure to grant Ms. White an advance for local travel does not constitute a materially adverse change in the terms of her employment. See *Fife v. City of Fort Wayne,* 241 F.3d 597, 602 (7th Cir.2001)(failure to reimburse plaintiff $156 for expenses incurred while attending work related seminar does not constitute adverse employment action.); *Neratko v. Frank,* 31 F.Supp.2d. 270, 299 (W.D.N.Y.1998)(delay in reimbursing employee for business-related travel caused by supervisor's refusal to complete travel voucher does not constitute adverse employment action). Similarly, the requirement that she complete a periodic status report does not rise to the requisite level. See *Gillum v. Federal Home Loan Bank,* 970 F.Supp. 843, 853 (D.Kan.1997)(requiring plaintiff to report to her supervisor before taking a break is not an adverse employment action); *Cox v. National Football League,* 29 F.Supp.2d 463, 471 (N.D.Ill.1998)(requiring professional football players to report their whereabouts during the off season does not constitute an adverse employment action).

Similarly, although Ms. White notes that her suspension

Case 1:07-cv-03498-AKH   Document 7-14   Filed 07/02/2007   Page 10 of 13

Not Reported in F.Supp.2d                                                                                                         Page 10
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

was based, at least in part, on her failure to attend meetings that conflicted with certain previously-scheduled appointments with EEO personnel, she first advised her superiors that the conflict was EEO-related after she had failed to appear. As the memorandum concerning her suspension makes clear, the problem that the EPA was addressing through its disciplinary process was not that Ms. White was engaging in protected activity, but that she had failed to provide her superiors with proper advance notice of her conflicting meetings. (*See* EPA Ex. U Attach. A2).

Ms. White also points to Harvey's deposition testimony that she was the only employee making " mistreatment complaints" as evidence of his retaliatory animus against her. (White Mem. at 22 (citing Harvey Dep. at 109)). As Harvey explained, however, " if you supervise a good number of people, more than ten or fifteen, you get a number of people from time to time who say they are not being treated fairly on the assignment or scheduling maybe." (Harvey Dep. at 109). This wholly neutral statement cannot conceivably be viewed as an indication that Harvey or his colleagues were retaliating against Ms. Harvey because she had filed an EEO complaint.

*12 Furthermore, Ms. White has not demonstrated a sufficient temporal nexus between her EEO complaints and the adverse employment actions to warrant an inference that the EPA was improperly retaliating against her. To establish such a causal link between protected activity and an adverse employment action, a plaintiff must show " that the protected activity was followed closely by the adverse action." *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996)(quoting *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)). Although the Second Circuit has not established a bright line rule for how brief the period must be, *see Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001), the Supreme Court recently has noted that the " cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality ... uniformly hold that the temporal proximity must be ' very close." ' *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001)(quoting *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (10th Cir.2001)).

Ms. White filed her EEO complaints in April and October of 1995, and she complains of retaliatory conduct beginning in September 1996 when she unsuccessfully applied for a GS-12 EP Specialist position. (White Mem. at 19; White Ex. 48). Accordingly, there is a gap of at least eleven months between her EEO-protected activity and the EPA's alleged retaliation. Courts in the Second Circuit faced with gaps of this magnitude have routinely rejected the suggestion that they should draw an inference that a causal connection exists between the protected activity and the employer's allegedly retaliatory conduct. *See, e.g., Hollander v. Am. Cynamid Co.,* 895 F.2d 80, 86 (2d Cir.1990)(district court properly found no causal nexus despite lapse of only three months between the protected activity and the adverse employment action); *Donlon,* 2001 WL 111220, at *3 (" the lapse of eight-and-one-half months between Donlon's submission of the written complaint and his firing is not sufficient, by itself, to imply causation" ); *Terry v. United States,* No. 98 Civ. 8249, 2000 WL 204522, at *10 (S.D.N.Y. Feb.18, 2000) (Buchwald, J.) (" There is a lapse in time of over six months between plaintiff's EEO complaint ... and his placement on administrative leave ... which, in the absence of other direct or circumstantial evidence of retaliation, is insufficient evidence of causal connection." ); *Daly v. Presbyterian Hosp.,* No. 98 Civ. 4253, 2000 WL 8268, at *6 (S.D.N.Y. Jan.4, 2000)(Buchwald, J.) (" There is a lapse of time of over one year which in the absence of other direct or circumstantial evidence of retaliation, is insufficient evidence of causation." ); *Adenji v. Admin. for Children Servs.,* 43 F.Supp.2d 407, 422 (S.D.N.Y.1999)(no causal connection given eleven-month gap).

*13 Only one case has been drawn to the Court's attention in which a causal connection was found despite the passage of eleven months before the alleged retaliation occurred. In that case, *Bernhardt v.. Interbank of New York,* 18 F.Supp.2d 218, 226 (E.D.N.Y.1998), the court observed that this lengthy period strongly suggested the absence of a causal link, but nevertheless declined to grant summary judgment against the plaintiff because the defendant bank was in a critical start-up phase at the time of the plaintiff's complaint and might therefore have had reason to delay his termination. Here, however, no such exceptional circumstances have been shown.

In an effort to close the temporal gap, Ms. White urges the Court to consider all of the events that occurred in this case from the date of her EEO complaints through the date nearly four years later that the EPA issued its final decision concerning her EEO complaints. (White Mem. at 18). The question, however, is whether the EPA retaliated against Ms. White for engaging in protected activity. Moreover, the last of that protected activity occurred in 1995 when Ms. White filed her formal charges of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03498-AKH  Document 7-14  Filed 07/02/2007  Page 11 of 13

Not Reported in F.Supp.2d                                                                                                      Page 11
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

discrimination against the EPA. If no nexus exists between that protected activity and the subsequent acts that are alleged to be retaliatory, no purpose would be served by considering a host of later events which, presumably, are even less likely to be retaliatory. *See Clark County,* 532 U.S. at 237, 121 S.Ct. at 1511 (EEOC's issuance of a right to sue letter-" an action in which the employee takes no part" -should not be the starting date for assessing the temporal proximity of alleged retaliation); *Donlon,* 2001 WL 111220, at *3 (measuring time lapse from date EEO complaint was filed); *Terry v. United States,* 2000 WL 204522, at *10 (same); *Lynk v. Henderson,* No. 98 Civ.2086, 2000 WL 178859, at *4 (S.D.N.Y. Feb. 15, 2000)(Cederbaum, J.)(same); *Suggs v. Port Auth. of N.Y. & N.J.,* No. 97 Civ. 4026, 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999)(Patterson, J.) (same).[FN5]

> FN5. Ms. White conceivably could have argued that the EPA's rejection of her application for the Personnel Management Specialist constituted the first act of retaliation, and, hence, was within three months of her initial EEO complaint. However, Ms. White admitted in her deposition that she had no experience in personnel management. (White Dep. at 223). Accordingly, even though the temporal gap would be briefer, Ms. White's retaliation claim still would fail because there is no causal link between the protected activity and the allegedly retaliatory act. *See Hollander,* 895 F.2d at 86.

Even if Ms. White were able to establish a prima facie retaliation case, the EPA has sustained its limited burden by setting forth the allegedly nondiscriminatory reasons for her suspension and termination. In substance, the EPA alleges that she was disciplined and later terminated because she was a difficult, and often uncooperative, employee. " It is widely acknowledged that reasons such as ... conflicts with persons in positions of authority constitute legitimate nondiscriminatory reasons justifying discharge ." *Williams v. McCausland,* No. 90 Civ. 7563, 1995 WL 548862, at *13 (S.D.N.Y. Sept.15, 1995) (Katz, Mag. J.)(quoting *Thermidor v. Beth Israel Med. Ctr.,* 683 F.Supp. 403, 412 (S.D.N.Y.1988)(Leisure, J.)). *See Neratko v. Frank,* 31 F.Supp.2d 270, 284 (W.D.N.Y.1998)(" [Employee's] contrariness and inability to get along with employers, supervisors, and co-workers fully qualified as legitimate, nondiscriminatory reasons for the adverse actions." ); *Sewall v. New York City Transit Auth.,* 809 F.Supp. 208, 230 (E.D.N.Y.1992)(" blatant employee insubordination is a legitimate reason for terminating employment" ).

*14 Since the EPA has proffered a legitimate nondiscriminatory reason for its actions, it becomes Ms. White's burden to show that a reasonable finder of fact could conclude that the EPA's explanation is false and that retaliatory animus was the true motivation for its decisions. *St. Mary's,* 509 U.S. at 511, 113 S.Ct. at 2749 n. 4, 2752. " Unlawful intent may be inferred from evidence such as biased statements or admissions, documentation of an atmosphere of discrimination pervading the workplace, the employer's general practices, statistical evidence, or evidence that other employees, who were not in a protected group but had similar records, were treated differently than the plaintiff." *McCausland,* 1995 WL 548862, at *14. Here, however, the record is devoid of any indication that any of the EPA's actions leading to Ms. White's termination were motivated by discriminatory or retaliatory intent. Quite to the contrary, it appears that the EPA was taking reasonable steps to try to broaden Ms. White's duties, such as sending her to North Carolina for air pollution training and making additional air pollution training available to her in New Jersey. The EPA also arranged for one-on-one training in Washington, D.C., to enhance her existing skills. Ms. White, on the other hand, plainly resisted the EPA's efforts to work with her. For example, she failed to keep her supervisors adequately apprised of her work progress, failed to provide timely notification of such problems as scheduling conflicts and not receiving permits, and imposed unreasonable requirements on her supervisors, including a demand that documents be placed in her " in box" rather than being given directly to her. Even if Ms. White were able to show that the EPA's view of one or more of these events is wrong, there is nothing about them which suggests that the EPA was seeking retribution for her earlier EEO complaints, or that any of these reasons cited by EPA as a basis for its decision to terminate her was pretextual.

The evidence also does not support Ms. White's conclusory allegation that she was improperly being singled out by the EPA or her supervisors. For example, as her own documentary evidence confirms, each of the EPA employees who was given a travel advance for local travel was either required to stay overnight or to be on duty at a remote location longer than their normal tour of duty. (*See* White Ex. 39). Ms. White did not fall within either of these recognized-and entirely nondiscriminatory-exceptions to the travel advance policy. Similarly, although she may have been the only EP Specialist reporting to Harvey who was required to submit a weekly report, this does not mean that this policy-which was applied to a large group of employees-was either

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03498-AKH    Document 7-14    Filed 07/02/2007    Page 12 of 13

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

discriminatory or retaliatory. Moreover, Ms. White has not adduced any evidence-other than her own conclusory testimony-that other similarly-situated employees were exempted from the reporting requirement.

*15 There also is no evidence that Ms. White was subjected to a hostile work environment. A plaintiff seeking to establish the existence of a racially hostile work place must show that it was " permeated with instances of racially discriminatory conduct such as ' discriminatory intimidation, ridicule, and insult" ' which are so severe that " the environment would reasonably be perceived, and is perceived, as hostile or abusive." See Williams v. County of Weschester, 171 F.3d 98, 101 (2d Cir.1999)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370,126 L.Ed.2d 295 (1993). In making this determination courts consider the totality of the circumstances, including the " frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." Harris, 510 U.S. at 23, 114 S.Ct. at 371. Here, even if this Court were to credit all of Ms. White's statements about the conditions she was subjected to, her workplace still would not amount to a racially hostile environment.

Finally, Ms. White has not shown that there were any nonminority or younger employees who were treated more leniently than she was. At best, she has argued that other employees were not required to submit regular activity reports. She has not shown, however, that there were any other EPA employees who had engaged in the sort of obstreperous conduct that she exhibited-such as providing late notice of a scheduling conflict and refusing to accept documents from a superior-who were not disciplined.

Ms. White also has not shown that she was treated disparately in terms of promotions following the filing of her EEO complaints. She alleges that she applied for two positions after those complaints were filed in 1995. The first position, as a Personnel Management Specialist, required experience in substantive personnel management work which Ms. White did not have. (White Dep. at 223). In any event, even if she had been qualified for this job, Ms. White cannot complain about disparate treatment since the EPA ultimately decided not to fill the position. (Id.).

The other position for which Ms. White applied was that of Program Analyst. By letter dated July 11, 1995, the EPA advised Ms. White that she had been found " qualified" for this vacancy but was not among the top-ranking candidates. (White Ex. 11). The EPA's letter went on to state that federal civil service regulations precluded further consideration of her candidacy because she was not " within the legal selection range." (Id.). Although Ms. White testified that it was common knowledge that the EPA " wasn't promoting Blacks," (see White Dep. at 217-20), she has failed to proffer any admissible evidence which would suggest that there was anything biased or retaliatory about the selection process for this position. Accordingly, there is no basis on which a reasonable finder of fact could find that the EPA acted improperly by offering this job to someone else. See Terry, 2000 WL 204522, at *5 (" conclusory allegations do not constitute evidence of discrimination in the selection process" ); James v. Newsweek, No. 96 Civ. 0393, 1999 WL 796173, at *11 (S.D.N.Y. Sept. 30, 1999) (" differences of opinion" as to hiring choices-when not supported by evidence of prohibited discrimination-are insufficient to prove discrimination).

*16 In sum, Ms. White has not shown, as she must, that a reasonable finder of fact could find that she was the victim of illegal retaliation for the filing of her EEO complaints. The EPA is therefore entitled to the dismissal of her retaliation claim.

D. *Continuing Violation*

Finally, although Ms. White failed to exhaust her administrative remedies with respect to any claim other than her complaint about the EPA's failure to promote her following the desk audit, she argues that she nevertheless should be able to proceed on her post-1995 discrimination claims because the EPA's conduct constitutes a " continuing violation." (White Mem. at 26). The Second Circuit has recognized a continuing violation exception under both Title VII and the ADEA. Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir.1997). Nevertheless, the exception applies only when a plaintiff is able to demonstrate either: (1) that the discriminatory acts complained of were committed pursuant to a specific discriminatory policy identified in her original EEO complaint, see Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir.1993); or (2) that the employer allowed a " series of specific, related acts of discrimination for so long as to amount to a discriminatory practice or policy." Nicholas v. NYNEX, 974 F.Supp. 261, 266, (S.D.N.Y.1997)(citing Lightfoot, 110 F.3d at 907). Isolated acts of discrimination do not suffice to demonstrate the existence of a practice or policy of discrimination. Id. Moreover, to rely on the continuing violation doctrine, a plaintiff must clearly assert a continuing violation in both her EEO filing and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 13
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

her district court complaint. *See Fitzgerald v. Henderson,* 251 F.3d 345, 363 (2d Cir.2001); *Nicholas,* 974 F.Supp. at 266.

Ms. White's attempt to expand her case through the continuing violation doctrine is wholly misplaced. First, apart from her conclusory and wholly unsupported assertions that the EPA was not promoting Blacks, Ms. White has failed to identify any specific EPA policy or practice that was the basis for her alleged mistreatment. Second, the acts about which Ms. White complains do not constitute a series of related acts, but, rather, involved numerous decision makers in a variety of circumstances. *See Nicholas,* 974 F.Supp. at 268-69 (refusing to apply continuing violation exception where plaintiffs " failed to offer any support, other than their own supposition, for the claim that these denials were part of a pattern of racial bias" ); *Lightfoot,* 110 F.3d at 907 (" [plaintiff] has presented no evidence to support his claim of a discriminatory policy or a connection between his job reassignments and a discriminatory animus" ); *see also Oshinsky v. N.Y.C. Hous. Auth.,* No. 98 Civ. 5467, 2001 WL 218395, at *9 (S.D.N.Y.2000)(Schwartz, J.)(fact that months had passed between acts of harassment is fatal to plaintiff's continuing violation argument). Finally, even if the acts were sufficiently related, Ms. White failed to raise a continuing violation theory of recovery in either of her 1995 EEO complaints.

## IV. *Conclusion*

*17 For the foregoing reasons, the Defendants' motion for summary judgment is granted, and the Clerk of the Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2002.
White v. Whitman
Not Reported in F.Supp.2d, 2002 WL 776589 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.